794 A.2d 120

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. WILLIAM E. STOTT, DEFENDANT–APPELLANT.

Argued November 5, 2001—Decided April 4, 2002.

*Salvatore Principato, Jr.*, argued the cause for appellant.

*Wendy Alice Way*, Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.*, Attorney General of New Jersey, attorney).

*Theodore S. Novak*, Deputy Public Defender, argued the cause for *amicus curiae* Office of the Public Defender (*Peter A. Garcia*, Acting Public Defender, attorney; *Mr. Novak* and *Stanley M. Shur*, Assistant Deputy Public Defender, on the brief).

*Michael J. Sullivan* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*McElroy, Deutsch & Mulvaney*, attorneys).

The opinion of the Court was delivered by

VERNIERO, J.

The Court is called on to evaluate defendant's right to be free of unreasonable searches in a hospital setting, as well as his right against self-incrimination. Defendant was a patient at a State-run psychiatric hospital. The police conducted a warrantless search of defendant's room, discovering a small quantity of Xanax, a controlled dangerous substance. On two separate days, the police interviewed defendant without counsel, and without advising him of his constitutional rights. Defendant incriminated himself in both interviews. The courts below determined that neither the search of defendant's hospital room nor the questioning by the police violated defendant's rights. We disagree and reverse.

## I.

The relevant facts are derived largely from testimony presented at a suppression hearing conducted by the trial court. Ancora

State Psychiatric Hospital (Ancora) is a facility operated by the New Jersey Department of Human Services (Department) in Camden County. By statute, the Department appoints and employs its own police officers who are "empowered to act as [ ] officer[s] for the detection, apprehension, arrest and conviction of offenders against the law[.]" *N.J.S.A.* 30:4–14b. Department officers maintain a station in Poplar Hall on the grounds of Ancora. The station is located on the first floor with at least one police office in the basement.

Defendant was committed involuntarily to Ancora in September 1997 after attempting to bleed himself to death. A person is subject to involuntary commitment when he or she is "mentally ill and ... dangerous to self or dangerous to others or property[.]" *N.J.S.A.* 30:4–27.9; *see also R.* 4:74–7 (outlining procedures for civil commitments of adults). A person so committed may be released only in accordance with the administrative discharge procedures set forth in *N.J.S.A.* 30:4–27.17, or pursuant to court order. *N.J.S.A.* 30:4–27.16. When admitted, defendant was nineteen years old and assigned to Ward C, Dormitory 216 in Larch Hall.

Within that dormitory, defendant shared a room with another patient, James Hilliard. Defendant's room was a typical residential hospital room, containing a bed and nightstand. In addition to those items, patients are furnished with an individual "wardrobe" to store clothing and other personal effects. The wardrobe may be locked, and each patient has a key for that purpose. Patients assigned.to Ward C are not permitted to walk around unsupervised. Similarly, patients cannot leave the ward unless a staff person has let them out. Hospital staff personnel regularly search the patients' rooms, including their wardrobes.

On the evening of October 7, 1997, defendant and Hilliard shared a quantity of heroin and each consumed two Xanax tablets before going to bed. When defendant awoke, he was ushered

immediately out of the room by the hospital staff. Defendant later discovered that Hilliard had died during the night, apparently from a drug overdose. When hospital staff persons found Hilliard's body, they called Department police officers and a member of the Camden County Prosecutor's Office to investigate the circumstances of Hilliard's death.

After their arrival, Department officers sealed off the area by posting a police guard outside defendant's room, locking the door to that room, and restricting access to the room to persons authorized to enter by the investigators. One officer testified that by the time he had arrived on the scene at 8:10 a.m., the ward already had been secured by a different officer. At about 8:42 a.m. another officer arrived on the ward; he was joined at approximately 8:45 a.m. by a detective from the homicide unit of the prosecutor's office. A total of five law enforcement officers were present at that juncture. Shortly after 10:00 a.m., the authorities removed Hilliard's body from defendant's room. The police guard testified that when he left his post at about 10:25 a.m., the door to defendant's room remained locked, and only a few staff persons had access to the room.

By the time the detective from the prosecutor's office had arrived, all of the patients in the area, including defendant, had been removed from their rooms and taken to the so-called day room. There, the detective interviewed numerous patients, including Anthony Fisher, who resided in the room across the hall from defendant. A total of twelve patients were questioned over a period of several hours.

At about 12:30 p.m. the detective interviewed Fisher. The patient told the detective that on the previous evening defendant had offered to sell him some Xanax pills. Fisher also stated that defendant had informed him that he (defendant) kept Xanax hidden in the hem of a curtain in his room. Based on that information, the detective and a Department police officer proceeded immediately to defendant's room. They searched the hem of the curtain and found four Xanax tablets. The officers did not obtain a warrant prior to conducting the search.

The detective acknowledged at the suppression hearing that, following the Fisher interview but prior to the search, nothing prevented the police from either repositioning an officer outside defendant's room or obtaining a warrant. The detective simply did not believe that a warrant was necessary. More specifically, the detective was asked, "Now was there anything preventing you at that point from posting a guard at the door of the room and securing a warrant?" He replied, "There was nothing but I didn't feel it was necessary."

At about 1:55 p.m. the detective approached defendant in the day room and asked him whether he "would [ ] accompany us over to the police department for an interview on this investigation[.]" (We assume that "us" refers to the fact that the detective and at least one other law enforcement officer brought defendant to the police station in Poplar Hall.) Of the twelve patients assembled in the day room, defendant was the only person taken to the police station for questioning. The detective stated that he informed defendant that "it was a voluntary interview" and, further, that he advised defendant more than once that he was "free to leave."

The early part of the interview was not recorded. The detective stated that defendant acknowledged during the interview's unrecorded portion "that he was involved with sharing drugs with the decedent[.]" Defendant also "admitted attempting to distribute drugs." In addition to the detective, at least one Department officer was present during that segment of the interview. The detective further testified that defendant's unrecorded admissions prompted his request for a taped statement.

The parties agree that at no time did the police inform defendant of his right to remain silent or to have a lawyer present before questioning. At the start of the taped segment, however, the interviewing officer asked defendant whether he was "willing to make a voluntary statement and a truthful statement about this matter." He replied, "Yes." The detective did not participate in the recorded portion of the interview. The record is clear that at

the detective's request a Department officer conducted that segment of the interview, which took place in the basement police office in the presence of one other officer.

Defendant gave a detailed account of the preceding evening. He said that he and Hilliard had "snorted" heroin between 7:30 p.m. and 8:00 p.m., and then "went out for [a] smoke break." After returning to their room, the two men continued to ingest heroin until defendant helped Hilliard into bed. Defendant then left the room to buy some sodas. Defendant stated that by the time he returned to the room Hilliard had moved from his (Hilliard's) bed into defendant's bed. With Anthony Fisher's assistance, defendant placed Hilliard back into his own bed. Defendant indicated that he himself slept from about midnight until the next morning when staff persons woke him following their discovery of Hilliard's body.

Defendant also described his involvement with the Xanax pills. Defendant stated that Hilliard informed him that he (Hilliard) had the pills available for sale and requested defendant's assistance in locating potential buyers. Defendant indicated that the asking price for the drug ranged from $5 to $10 per tablet, "depending on the patient." Defendant stated that Hilliard also had spoken to Fisher about the pills.

Toward the end of the interview the police officer asked defendant, "has this statement been given voluntarily and of your own free will?" Defendant replied, "For the most part." The officer then asked, "What do you mean for the most part?" Defendant replied, "I don't feel that I was ready to speak to police at all today but sometimes you gotta do what you gotta do." When asked again whether any person had forced him to give his statement, defendant replied, "No." After having defendant listen to his recorded statement, the police officer again asked, "Has this statement been given voluntarily and of your own free will?" Defendant replied, "Yes."

Defendant briefly left Ancora to participate in a drug rehabilitation program at a different facility. Under Department escort,

defendant returned to Ancora on October 24, 1997. The escort took defendant to the basement police office where an officer again questioned him without counsel and without advising him of his rights under *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). Defendant reiterated that he and Hilliard had ingested heroin and that they had shared Xanax on the evening preceding Hilliard's death. Defendant denied trying to sell Xanax to other patients. The escort remained with defendant during the course of that second interview.

The interviewing officer testified that defendant was "a definite suspect for offering to sell the Xanax" at the time of the October 24, 1997, interview. About a week later, the officer filed a criminal complaint against defendant. In a subsequent two-count indictment, defendant was charged with possession of a controlled dangerous substance, in violation of *N.J.S.A.* 2C:35–10a(1) (count one), and possession of a controlled dangerous substance with intent to distribute, in violation of *N.J.S.A.* 2C:35–5a(1), –5b(13) (count two).

Defendant moved before the trial court to suppress both the seized Xanax and the incriminating statements that he had given to the police. The trial court denied both motions. Thereafter, defendant pleaded guilty to the second count of the indictment, and the trial court sentenced him to five years probation with certain conditions. In a reported decision, the Appellate Division affirmed. *State v. Stott*, 335 *N.J.Super.* 611, 623, 763 *A.*2d 324 (2000). We granted defendant's petition for certification. 167 *N.J.* 637, 772 *A.*2d 938 (2001). We also granted *amicus curiae* status to the Office of the Public Defender, Division of Mental Health and Guardian Advocacy (OPD), and the Association of Criminal Defense Lawyers (ACDL).

## II.

### A.

We begin our analysis by observing these familiar principles.

> Consistent with the Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution, police officers must obtain a warrant from a neutral judicial officer before searching a person's property, unless the search "falls within one of the recognized exceptions to the warrant requirement." . . .
>
> Once a court determines that a warrantless search has occurred, its inquiry shifts to whether the search fits within a valid exception to the warrant requirement. In that regard, the burden is on the State to prove that its search was permissible.
>
> [*State v. DeLuca*, 168 *N.J.* 626, 631–32, 775 *A.*2d 1284 (2001) (internal citations omitted).]

 A search implicates the above principles only when an accused " 'has a legitimate expectation of privacy in the invaded place.' " *Minnesota v. Olson*, 495 *U.S.* 91, 95, 110 *S.Ct.* 1684, 1687, 109 *L.Ed.*2d 85, 92 (1990) (quoting *Rakas v. Illinois*, 439 *U.S.* 128, 143, 99 *S.Ct.* 421, 430, 58 *L.Ed.*2d 387, 401 (1978)); *DeLuca, supra*, 168 *N.J.* at 631, 775 *A.*2d 1284. Further, "[a] subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable[.]" *Olson, supra*, 495 *U.S.* at 95–96, 110 *S.Ct.* at 1687, 109 *L.Ed.*2d at 92 (internal citations and quotations omitted); *see also State v. Hempele*, 120 *N.J.* 182, 200, 576 *A.*2d 793 (1990) (discussing reasonableness requirement under State Constitution).

In *Katz v. United States*, 389 *U.S.* 347, 352, 88 *S.Ct.* 507, 511, 19 *L.Ed.*2d 576, 582 (1967), the United States Supreme Court examined a suspect's privacy interest in a public telephone booth and concluded that telephone conversations within that location were constitutionally protected. The Court stated, "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351, 88 *S.Ct.* at 511, 19 *L.Ed.*2d at 582 (internal citations omitted). A concurring member of the Court reasoned that certain spaces otherwise "accessible to the public" could, at times, be considered a "temporar[y] private place" in which its "momentary occupants' expectation of freedom from intrusion" would trigger constitutional pro-

tections. *Id.* at 361, 88 *S.Ct.* at 517, 19 *L.Ed.*2d at 588 (Harlan, J., concurring).

A threshold question, then, is whether as a psychiatric patient defendant maintained a reasonable expectation of privacy in the area of his room searched by the detective. Because that is a question of first impression, we must consider analogous concepts found in our prior case law and in other jurisdictions. In that regard, this Court has stated that "[t]here is a lesser expectation of privacy in one's automobile, and in one's office, than in one's home." *State v. Johnson,* 168 *N.J.* 608, 625, 775 *A.*2d 1273 (2001) (internal citations omitted). We also have recognized that "[a]n individual's privacy interests are nowhere more clearly defined or protected by the courts than in the home[,] the core of [F]ourth [A]mendment rights." *Ibid.* (quoting *Kornegay v. Cottingham,* 120 *F.*3d 392, 399–400 (3d Cir.1997) (internal quotations omitted)).

With those concepts in mind, we accept as a basic premise that a hospital room is more akin to one's home than to one's car or office. It is a place to shower, dress, rest, and sleep. The duration of one's stay at a facility also may be relevant to the analysis. For example, a patient admitted for long-term care may enjoy a greater expectation of privacy than one rushed to an emergency room and released that same day. Moreover, the nature or scope of the privacy interest may differ depending on the facts and circumstances of a given case. Along those lines, one commentator has observed that

the circumstances under which one is brought to the hospital may be significant.... The emergency room, by its very nature, functions as a freely accessible area over which a patient has no control and where his privacy is diminished. For example, in a hospital emergency room during the throes of an emergency, a patient may neither expect to restrict access to the room to specific individuals according to his or her desire, nor to regulate whether other patients or families are present in the room.

In a private or semi-private hospital room, however, although the hospital staff must enter the room regardless of the patient's wishes, the patient may at least restrict the access of visitors or non-medical personnel. In that way, a patient may control the degree of privacy within the room. In fact, it is possible for the hospital to respect a patient's request for privacy in the room for a certain time period; such a request would be unreasonable in an emergency room setting.

Even when a patient consents to the presence of hospital employees in the room, it has been held that such consent does not waive the otherwise reasonable expectation of privacy from police intrusion that one may enjoy in a hospital room. [Michael T. Flannery, *First, Do No Harm: The Use of Covert Video Surveillance to Detect Munchausen Syndrome by Proxy—An Unethical Means of "Preventing" Child Abuse*, 32 *U. Mich. J.L. Reform* 105, 155–56 (1998).]

Courts in other jurisdictions have reasoned similarly. *See, e.g., Buchanan v. State*, 432 *So.*2d 147, 148 (Fla.Dist.Ct.App.1983) (finding no reasonable expectation of privacy in emergency room of hospital); *Jones v. State*, 648 *So.*2d 669, 676–77 (Fla.1994) (observing that defendant reasonably could expect that police would not make warrantless seizure of his clothing, not found in plain view, in his hospital room), *cert. denied sub nom., Jones v. Florida*, 515 *U.S.* 1147, 115 *S.Ct.* 2588, 132 *L.Ed.*2d 836 (1995); *Morris v. Commonwealth*, 208 *Va.* 331, 157 *S.E.*2d 191, 195 (1967) (holding that warrantless seizure of defendant's clothing from private hospital room was improper).

■ In this case, the order that resulted in defendant's commitment directed that a hearing be conducted within twenty days of his initial inpatient admission to Ancora. *R.* 4:74–7(c)1. That suggested that defendant's stay would be of some duration. Indeed, at the time of the search, defendant had been a patient for about two weeks. Containing a bed, curtains, a nightstand, and defendant's personal wardrobe, defendant's room had many of the attributes of a private living area and, by our reading of the record, had served as such a place throughout defendant's occupancy. Under those circumstances, we are satisfied that defendant had a reasonable expectation of privacy in the area searched by the police within the constitutional meaning of those terms.

In urging a contrary conclusion, the State emphasizes that the police limited their search to the hem of the curtain found in defendant's room, that the curtain itself was issued by the State and did not belong to defendant, and that defendant shared the area with a roommate, facts that greatly diminished defendant's overall privacy expectations. Succinctly stated, the State argues that defendant's asserted privacy interests under the totality of

the facts are not reasonable and, therefore, that the search must be sustained.

We disagree. Although the officers focused their search on the hem of the curtain, the curtain was part of the broader living area of defendant's room. It is the room as a whole that implicates the expectation of privacy in this setting. To conclude otherwise would require the Court arbitrarily to determine which areas or objects within the same general living space are truly private. As an example, we would be hard pressed to justify finding that the bed, but not the nightstand, triggers a privacy interest. The same would be true in trying to distinguish the wardrobe from the curtain. In our view, such line drawing would "lead ultimately to a patchwork of incongruous case law. We serve the criminal justice system best by enforcing clear and uniform rules whenever appropriate under the circumstances." *Johnson, supra,* 168 *N.J.* at 623, 775 *A.*2d 1273.

Moreover, that the curtain may have been issued by the State is of no constitutional significance in this context. The United States Supreme Court has recognized the "unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from government intrusion into that place." *Rakas, supra,* 439 *U.S.* at 142, 99 *S.Ct.* at 430, 58 *L.Ed.*2d at 400. Applying that principle, the Court has observed that overnight guests have the same or similar expectation of privacy in the homes of their hosts as do the hosts or owners. *Olson, supra,* 495 *U.S.* at 98, 110 *S.Ct.* at 1689, 109 *L.Ed.*2d at 94. We reason by analogy in this case. Defendant was committed involuntarily to a State-run hospital because of illness and not as part of a criminal sentence. In that position, defendant cannot be denied his right to be free of unreasonable searches merely because he does not "own" his surroundings.

Similarly, the fact that defendant's roommate may have had access to the curtain does not alter the fact that the search occurred in defendant's individual living space. "The accessibility of [the area searched] to outsiders [ ] is not dispositive, because a

person can maintain a privacy interest in something that is not completely invulnerable to prying eyes. Otherwise [A]rticle I, paragraph 7 would protect only that which is under lock-and-key." *Hempele, supra,* 120 *N.J.* at 204, 576 *A.*2d 793. The case might be different if the police had searched Hilliard's personal wardrobe. Instead, they searched that part of the room in which defendant maintained an expectation of privacy at least equivalent to that of his roommate. Consequently, the roommate's shared access to defendant's room does not alter our analysis. See *United States v. Jeffers,* 342 *U.S.* 48, 52, 72 *S.Ct.* 93, 96, 96 *L.Ed.* 59, 65 (1951) (finding defendant had sufficient privacy interest to challenge warrantless search of hotel room during which police found cocaine in top shelf of closet, notwithstanding that defendant shared room with two aunts).

■ Our inquiry does not end there. Inasmuch as we have found that defendant possessed a privacy interest in that part of his room searched by the police, the Court's inquiry now must shift "to whether the search fits within a valid exception to the warrant requirement." *DeLuca, supra,* 168 *N.J.* at 632, 775 *A.*2d 1284. Exigent circumstances provide a basis for one such exception. As a general rule, "circumstances are exigent when they 'preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both.'" *Ibid.* (quoting *State v. Smith,* 129 *N.J.Super.* 430, 435, 324 *A.*2d 62 (App.Div.), *certif. denied,* 66 *N.J.* 327, 331 *A.*2d 27 (1974)).

■ Significantly, an officer's belief that exigent circumstances are present must be based on more than mere speculation. *United States v. Restrepo,* 890 *F.Supp.* 180, 207 (E.D.N.Y.1995) (observing that "law enforcement officials' speculative belief in the presence of [ ] suspects armed with weapons or posed to dispose of evidence" is insufficient to "constitute an exigency justifying an intrusion"). Within that broad framework, courts undertake a fact-sensitive analysis and consider many elements in determining

whether exigency exists in a given circumstance. *DeLuca, supra,* 168 *N.J.* at 632, 775 *A.*2d 1284. Those factors include

> the degree of urgency and the amount of time necessary to obtain a warrant; the reasonable belief that the evidence was about to be lost, destroyed, or removed from the scene; the severity or seriousness of the offense involved; the possibility that a suspect was armed or dangerous; and the strength or weakness of the underlying probable cause determination.
>
> [*Id.* at 632–33, 775 *A.*2d 1284.]

Applying those tenets, we note that there is no suggestion in the record that a suspect was armed or dangerous or that officer safety was compromised. Additionally, given the heavy presence of law enforcement at the scene, there was no objectively reasonable basis to believe that evidence was about to be lost, destroyed, or removed from defendant's room. In that regard, the trial court found that defendant's "room had been secured to the point that no patients could enter it, and that the room continued to be secured and protected at the point when the police subsequently learned that the pills were in the hem of the curtain."

Although the trial court disagreed with the State in respect of exigency, it ultimately upheld the search based on its conclusion that defendant did not possess the requisite privacy interest in his room. The Appellate Division reached precisely the opposite conclusions. The panel agreed with defendant that he maintained a legitimate expectation of privacy in the area searched, but found that exigent circumstances excused the warrant requirement. *Stott, supra,* 335 *N.J.Super.* at 620, 622, 763 *A.*2d 324. The Appellate Division explained:

> From our review of the record we are satisfied that there was a significant period of time during which people may have had access to the room. Even if one concluded that patients were barred from entering the room in light of the ongoing investigation, the police could not exclude the possibility of a rogue employee entering and retrieving the contraband.
>
> [*Id.* at 622, 763 *A.*2d 324.]

Based on that review, the court determined that "the officers were confronted with exigent circumstances and were fully justified in looking for and retrieving the offending pills." *Ibid.*

360

We view the record differently for two reasons. First, to the extent that the record reasonably supports the trial court's factual finding that defendant's room had been secured, that finding must be accepted on appeal. *State v. Locurto*, 157 *N.J.* 463, 470–71, 724 *A.*2d 234 (1999) (citing *State v. Johnson*, 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)). Second, even if we were to assume that there was a period in which the room was unsecured, we do not agree that that fact, by itself, gives rise to an objectively reasonable belief that evidence would have been destroyed or removed from the scene.

Following their discovery of Hilliard's body, hospital staff persons awakened defendant and removed him immediately from his room. The other patients in the vicinity also were moved into the day room. The police then questioned those patients well into the afternoon. We infer from the record that, although the guard stationed outside defendant's room had left that location after the police had removed Hilliard's body, defendant and his fellow patients remained positioned in the day room until the detective had completed the search. The record also indicates that defendant's room was locked throughout the relevant period. That defendant or the other patients would have had the opportunity to enter defendant's room to remove or destroy the Xanax is unlikely under those circumstances.

Moreover, the detective who conducted the search acknowledged at the suppression hearing that defendant's room could have been secured to enable the police to obtain a warrant. That acknowledgement weighs strongly in favor of defendant's assertion that no exigency existed to justify the search. See *Jeffers, supra*, 342 *U.S.* at 52, 72 *S.Ct.* at 95, 96 *L.Ed.* at 64 (finding no exigency in case in which "the officers admit[ted] they could have easily prevented any [ ] destruction or removal [of evidence] by merely guarding the door"); *State v. Lewis*, 116 *N.J.* 477, 488, 561 *A.*2d 1153 (1989) (finding no exigency in case in which "there [was] no evidence in the record to suggest that the premises could not

have been safely secured while one of the officers obtained a search warrant").

Further, we consider the possibility that a "rogue employee" could have tampered with the evidence to be too speculative to form a well-grounded or objectively reasonable basis on which to excuse the warrant requirement. *Restrepo, supra,* 890 *F.Supp.* at 207. In view of the totality of the facts, we are satisfied that the State has not carried its burden of demonstrating the propriety of its warrantless conduct under the doctrine of exigency.

■ The Appellate Division also alluded to the "community-caretaker" exception to the warrant requirement. *Stott, supra,* 335 *N.J.Super.* at 622 n. 1, 763 *A.*2d 324. In a nutshell, that exception applies to police conduct that is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.*2d 706, 715 (1973). For example, the police do not need a warrant " 'to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person.' " *State v. Garbin,* 325 *N.J.Super.* 521, 526, 739 *A.*2d 1016 (App.Div.1999) (quoting *Wayne v. United States,* 318 *F.*2d 205, 212 (D.C.Cir.), *cert. denied,* 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.*2d 86 (1963)), *certif. denied,* 164 *N.J.* 560, 753 *A.*2d 1153 (2000).

■ The actions here, as more fully described below, were not divorced totally from a criminal investigation. Rather, the police conducted the search of defendant's room specifically to acquire evidence of a crime, namely, the Xanax tablets. The community-caretaker exception does not apply on those facts.

Lastly, we are satisfied that the police had addressed any legitimate concern for safety by positioning the patients in the day room at the beginning of their investigation. Unlike our dissenting colleagues, we find no reasonable support in the record for the inference that the drugs already had been removed and posed a threat by the time the detective had learned of their whereabouts.

Indeed, the detective's testimony, namely, that he "wanted to get them [the drugs] out of there [defendant's room] and get them in our possession[,]" belies any such inference that the contraband was anywhere other than in defendant's room. As we have noted in other contexts, "Neither 'inarticulate hunches' nor an [ ] officer's subjective good faith can justify an infringement of a citizen's constitutionally guaranteed rights." *State v. Arthur,* 149 *N.J.* 1, 8, 691 *A.*2d 808 (1997) (citation omitted).

## B.

We hold, therefore, that the fruits of the search cannot be used in a criminal prosecution. Our disposition is not to be construed as prohibiting all warrantless searches conducted in a hospital setting. To the contrary, as observed elsewhere in this opinion, whether a patient's expectation of privacy is reasonable so as to trigger constitutional safeguards depends on many factors. In that regard, we echo the sentiments expressed by one California court:

> [T]he question of privacy in a hospital does not merely turn on a general expectation of privacy in use of a given space, but to some degree depends on the person whose conduct is questioned. Clearly, although by checking himself [or herself] into a hospital, a patient may well waive his [or her] right of privacy as to hospital personnel, it is obvious that he [or she] has not turned [his or her] room into a public thoroughfare.... The patient knows and expects that nurses, doctors, food handlers, and others enter and leave [his or her] hospital room in accordance with the medical needs of the patient and the hospital routine. On the other hand, a hospital room is clearly not a public hall which anyone in the building is free to use as needed. Thus, at least for certain purposes, a hospital room is fully under the control of the medical staff; yet for other purposes it is "the patient's room."
>
> [*People v. Brown,* 88 *Cal.App.*3d 283, 151 *Cal.Rptr.* 749, 754 (1979).]

Those differing contours are especially relevant when evaluating searches undertaken in a psychiatric hospital or similar facility. We would expect doctors, nurses, and other hospital personnel to inspect all areas of such a facility to ensure that patients are not in a position to harm either themselves or others. That type of hospital-related action is not the subject of this appeal. Rather, we are presented with police conduct that occurred in defendant's living area, within the framework of a criminal investigation

prompted by the death of a patient. The participation of law enforcement officers transformed this search from what might have been an objectively reasonable intrusion by hospital staff into the kind of warrantless police action prohibited by our federal and State Constitutions.

In an analogous context, this Court has suggested that a search of an employee's office, permissible if conducted by the employer, may be rendered invalid if undertaken by the police. As Justice Clifford explained for the Court:

> Unreasonable police searches are often impermissible in areas accessible to other third parties. For example, a government employee can have a reasonable expectation of privacy in his or her office even though "it is the nature of government offices that others—such as fellow employees, supervisors, consensual visitors, and the general public—may have frequent access to an individual's office." The constitutional prohibition on unreasonable government searches "'does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer.'"
>
> [Hempele, supra, 120 N.J. at 204–05, 576 A.2d 793 (internal citations omitted).]

The Court has no doubt that the officers were present in defendant's room for the purpose of carrying out their statutory function to apprehend and convict criminal offenders, including defendant. N.J.S.A. 30:4–14b. Even if we were to assume that the police arrived on the scene merely to assist in some lesser administrative role, the involvement of a member of the homicide unit of the prosecutor's office convinces us that the search was part of a criminal investigation on the State's behalf. As such, the fruits of the warrantless search must be suppressed. See State v. Ravotto, 169 N.J. 227, 245, 777 A.2d 301 (2001) (concluding that once police officers assisted hospital nurse in forced taking of defendant's blood, they independently could not acquire that evidence consistent with constitutional guarantees).

Finally, although we have applied federal case law in evaluating the search of defendant's room, we also conclude expressly that the search was impermissible under the New Jersey Constitution for the reasons already enunciated. In reaching that conclusion, the Court does not perceive that its disposition will hamper unduly the legitimate functions of law enforcement. As is true of so much

of our search-and-seizure jurisprudence, the analysis that we have employed "is fact sensitive and offers no sure outcomes in future cases." *Id.* at 250, 777 *A.*2d 301. Consequently, our holding is limited to the unique facts of this case.

### III.

#### A.

We turn next to the question whether defendant's right against self-incrimination was abridged under the totality of the circumstances. This Court previously has stated:

> The privilege against self-incrimination, as set forth in the Fifth Amendment to the United States Constitution, is one of the most important protections of the criminal law. We do not have a similar provision in our State Constitution; however, "the privilege itself 'is firmly established as part of the common law of New Jersey and has been incorporated into our Rules of Evidence.'"
>
> [*State v. Presha,* 163 *N.J.* 304, 312–13, 748 *A.*2d 1108 (2000) (internal citations omitted).]

 The right against self-incrimination, and the corollary requirement that a suspect be informed of that right, are triggered "when an individual is taken into custody or otherwise deprived of his [or her] freedom by the authorities in any significant way and is subject to questioning[.]" *Miranda, supra,* 384 *U.S.* at 478, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726. The requirement that interrogators warn suspects of certain rights is deemed necessary due to the pressure inherent in an "incommunicado interrogation of individuals in a police-dominated atmosphere[.]" *Id.* at 445, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707.

 Whether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernible.

> It is clear that custody in the *Miranda* sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station.
>
> . . . .
>
> We are satisfied that no precise definition can be formulated which would apply in advance to all cases and prescribe the outer limits of the protection

afforded. The problem must be dealt with through a case-by-case approach in which the totality of the circumstances must be examined.

[*State v. Godfrey*, 131 *N.J.Super.* 168, 175–77, 329 *A.*2d 75 (App.Div.1974), *aff'd o.b.*, 67 *N.J.* 267, 337 *A.*2d 371 (1975).]

██ This Court also has explained that "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, and the status of the suspect[.]" *State v. P.Z.*, 152 *N.J.* 86, 103, 703 *A.*2d 901 (1997). Another factor is whether a suspect knew that he or she was a focus of the police investigation. *Stansbury v. California*, 511 *U.S.* 318, 325, 114 *S.Ct.* 1526, 1530, 128 *L.Ed.*2d 293, 300 (1994); *State v. Pearson*, 318 *N.J.Super.* 123, 134, 723 *A.*2d 84 (App.Div.1999).

██ In applying those tenets we hold that, given the absence of *Miranda* warnings, defendant's statements must be suppressed. The Court notes that there is no serious dispute that the police "interrogated" defendant during the course of his interviews. At least one officer acknowledged at the suppression hearing that his questions of defendant were likely to elicit incriminating responses. See *Rhode Island v. Innis*, 446 *U.S.* 291, 301, 100 *S.Ct.* 1682, 1689–90, 64 *L.Ed.*2d 297, 308 (1980) (defining interrogation as direct questions likely to result in incriminating statements). Accordingly, we will focus the balance of our analysis on whether defendant was "in custody."

The place of the interrogation and the status of the interrogators weigh in favor of defendant's assertion that he was in custody. The police questioned defendant in a secluded basement area within the Ancora complex, an area reserved solely for police purposes. Isolated from other patients, defendant was questioned on two separate days by a total of four law enforcement officers whose status as criminal investigators was clear.

In addition, there were objective indications that defendant was a suspect. For example, defendant was singled out for questioning, he was asked direct questions about illegal drug activities, and

his statements were recorded. In our view, a reasonable person in defendant's position would conclude from those circumstances that he was, or was becoming, a focus of a police investigation.

Defendant's status as an involuntarily-committed psychiatric patient at a State-run facility also is relevant to the analysis. The Supreme Court has recognized that involuntary commitment to a treatment facility is a "massive curtailment of liberty." *Humphrey v. Cady*, 405 *U.S.* 504, 509, 92 *S.Ct.* 1048, 1052, 31 *L.Ed.*2d 394, 402 (1972). Consistent with that observation, defendant's freedom of movement was circumscribed on a daily basis. One officer testified that defendant, as a "level two" patient, was not permitted to exit his ward or walk the grounds of the Ancora complex without a Department escort. We are satisfied that a patient subjected to that level of restriction would not feel free to leave an interrogation conducted in the hospital's basement police office. Defendant said as much when he told the officers during his taped statement that "I don't feel that I was ready to speak to police at all today but sometimes you gotta do what you gotta do."

The State presents a threefold argument in advocating for a contrary result. First, it contends that defendant was not in custody because the officers were not overbearing, and the interrogation room was not inherently intimidating. Second, the State asserts that defendant was familiar with police practices because of prior arrests not relevant to this appeal, indicating that he was well aware of the consequences of speaking to the police. Third, the State emphasizes that the police repeatedly informed defendant that he was free to leave the interrogation area and sought his assurance that he was responding voluntarily to their questions.

We disagree with the State's first claim that defendant's surroundings, including the manner in which he was questioned, were not inherently coercive. Defendant was subjected to an incommunicado interrogation in a police-dominated atmosphere, during which he made self-incriminating statements without being informed of his constitutional rights. That is precisely the practice

that *Miranda* sought to avoid. *Miranda, supra,* 384 *U.S.* at 445, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707.

 In respect of defendant's criminal history, the State's argument is misplaced. A suspect's sophistication with the criminal justice system is relevant in determining whether an accused in a custodial setting has knowingly and voluntarily waived his or her rights. *Presha, supra,* 163 *N.J.* at 313, 748 *A.*2d 1108. That determination is distinct from the threshold evaluation concerning whether a suspect should have been informed of those rights in the first instance. *Miranda, supra,* 384 *U.S.* at 468, 471–72, 86 *S.Ct.* at 1624, 1626, 16 *L.Ed.*2d at 720, 722 (instructing that required warnings are "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere" and that "[n]o amount of circumstantial evidence that the person may have been aware of [his or her] right[s] will suffice to stand in [their] stead").

 Equally unavailing is the State's final contention regarding the officers' statements to defendant that he was free to leave the interrogation area. The fundamental aspect of any custody analysis is a factual inquiry into the totality of the circumstances. *Godfrey, supra,* 131 *N.J.Super.* at 177, 329 *A.*2d 75. Thus, an interrogating officer's declaration to a suspect that he or she may terminate an interview does not always mitigate a custodial atmosphere. *South Dakota v. Long,* 465 *F.*2d 65, 70 (8th Cir.1972), *cert. denied sub nom., Hale v. South Dakota,* 409 *U.S.* 1130, 93 *S.Ct.* 951, 35 *L.Ed.*2d 263 (1973); *see also State v. Micheliche,* 220 *N.J.Super.* 532, 534–35, 538, 533 *A.*2d 41 (App.Div.) (finding defendant in custody at prosecutor's office for *Miranda* purposes, notwithstanding that he came voluntarily to that office and signed form prior to questioning that indicated "I am appearing for this questioning voluntarily, and I am aware that I am free to terminate the questioning and leave at anytime I so choose"), *certif. denied,* 109 *N.J.* 40, 532 *A.*2d 1108 (1987).

Here, the severe restrictions already imposed on defendant, as an involuntarily committed patient, provide the context within which to evaluate the officers' statements. Simply put, defendant

was unable to move freely within any area of Ancora. Consequently, the phrase "you are free to leave," when stated to this particular defendant, is "not a talisman in whose presence the [Fifth] Amendment fades away and disappears." *Coolidge v. New Hampshire*, 403 *U.S.* 443, 461, 91 *S.Ct.* 2022, 2035, 29 *L.Ed.*2d 564, 580 (1971). In sum, under the totality of the circumstances, we conclude that defendant was in custody during his interviews for purposes of *Miranda* because the interrogations took place in a police-dominated atmosphere, there were objective indications that defendant was a suspect, and his movements were circumscribed as a result of his commitment status.

### B.

The OPD and ACDL, as *amici curiae*, suggest that the Court use this occasion to adopt a *per se* rule requiring the presence of counsel or some other enhanced protection whenever the police conduct a custodial interrogation of a psychiatric patient. We have resolved the interrogation issue solely on the ground that defendant should have been informed of his rights under *Miranda* before the start of questioning. Accordingly, discussion or adoption of the rule suggested by *amici curiae* is not necessary to our analysis. The Court trusts, however, that future custodial interrogations of psychiatric patients will be "conducted with the utmost fairness and in accordance with the highest standards of due process and fundamental fairness." *In re S.H.*, 61 *N.J.* 108, 115, 293 *A.*2d 181 (1972).

For completeness we note that, similar to the disposition concerning the search of defendant's room, our holding in respect of defendant's statements is based "not only on our understanding of federal constitutional law, but on our state common-law privilege against self-incrimination as well." *State v. Hartley*, 103 *N.J.* 252, 284, 511 *A.*2d 80 (1986). Along those lines, Justice Handler has observed:

> We have [ ] recognized as a matter of state law that a statement taken in violation of *Miranda* may not be directly used as affirmative evidence of criminal

guilt by the prosecution. See *State v. Gosser*, 50 *N.J.* 438, 445–46, 236 *A.*2d 377 (1967), *cert. denied*, 390 *U.S.* 1035, 88 *S.Ct.* 1434, 20 *L.Ed.*2d 295 (1968) (exclusionary rule of *Miranda* bars from evidence statements made by a defendant during in-custody interrogation unless he has been advised of his *Miranda* rights and knowingly and intelligently waived such rights); *State v. Vigliano*, 50 *N.J.* 51, 64, 232 *A.*2d 129 (1967) (evidence obtained in the absence of prescribed *Miranda* warnings is inadmissible); *State v. Lutz*, 165 *N.J.Super.* 278, 283–84, 398 *A.*2d 115 (App.Div.1979) (in the absence of *Miranda* warnings statements made by the defendant, whether exculpatory or inculpatory, may not be used by the prosecution).

> [*Id.* at 299–300, 511 *A.*2d 80 (Handler, J., concurring in part and dissenting in part).]

Emulated in our State jurisprudence, the bright-line rule established by *Miranda* not only has withstood the test of time but also has been elevated to a place of constitutional prominence. *See Dickerson v. United States*, 530 *U.S.* 428, 443, 120 *S.Ct.* 2326, 2336, 147 *L.Ed.*2d 405, 419 (2000) (reaffirming *Miranda* rule in part because it "has become embedded in routine police practice to the point where the warnings have become part of our national culture"). In the last analysis, "[w]e do no more than apply our existing jurisprudence to the particular circumstances of this case." *Johnson, supra*, 168 *N.J.* at 623, 775 *A.*2d 1273. In so doing, we are compelled to suppress defendant's statements for the reasons already expressed.

## IV.

The judgment of the Appellate Division is reversed.

LaVECCHIA, J., concurring in part and dissenting in part.

The majority concludes that defendant, an involuntarily committed psychiatric patient in a State-run institution, was subjected to an unreasonable search when hospital security and an investigator from the Camden County Prosecutor's office conducted a warrantless search and found contraband pills secreted in the hem of the curtain in his ward room. They did so after another psychiatric patient died suddenly during the night from an apparent overdose of controlled dangerous substances and after they were told there were Xanax pills hidden in the room. The majority finds the

search violated the reasonable privacy expectations of a patient involuntarily committed to a psychiatric institution. I disagree that the search in this case violated defendant's reasonable expectations of privacy. I also disagree with the majority's conclusion that a warrantless search was not justified by the totality of the circumstances. I therefore dissent.

The analysis starts, as it must, with examination of the nature of the privacy interest at stake. Did defendant have a reasonable expectation of privacy in the hem of the curtain in the ward room he shared with another, now-deceased, psychiatric patient? The majority answers that question with the general proposition that hospital patients have an expectation of privacy in their hospital rooms. *Ante* at 355. The general proposition may be correct, but it does not fit the circumstances of this case.

Our search and seizure jurisprudence is based on the premises that general social norms establish expectations of privacy and that an individual's expectations in respect of privacy must be objectively reasonable. *State v. Hempele*, 120 *N.J.* 182, 200, 576 *A.*2d 793 (1990). It follows that an individual's privacy interest in the home is accorded the most deference in state and federal constitutional law. *State v. Johnson*, 168 *N.J.* 608, 625, 775 *A.*2d 1273 (2001) (citing *Kornegay v. Cottingham*, 120 *F.*3d 392, 399–400 (3d Cir.1997)). Other settings also enjoy recognized expectations of privacy, although they do not receive the same deference as that accorded to one's home. *United States v. Thomas*, 729 *F.*2d 120, 123–24 (2d Cir.1984) (stating that citizen's expectation of privacy is less in office than in residence); *United States v. Mankani*, 738 *F.*2d 538, 542–45 (2d Cir.1984) (recognizing that defendant had diminished expectation of privacy in motel room).

One such setting is an inpatient hospital room, which carries "some indicia of privacy, even if not to the degree otherwise enjoyed in one's private home." Michael T. Flannery, *First, Do No Harm: The Use of Covert Video Surveillance to Detect Munchausen Syndrome By Proxy An Unethical Means of Preventing Child Abuse*, 32 *U. Mich. J.L. Ref.* 105, 154 (1998). See

*Jones v. State*, 648 *So.*2d 669, 676–77 (Fla.), *cert. denied*, 515 *U.S.* 1147, 115 *S.Ct.* 2588, 132 *L.Ed.*2d 836 (1995) (finding that defendant did not have heightened expectation of privacy in his hospital room that he would have had in his home, and noting that although defendant could expect that hospital personnel would enter to perform routine hospital procedures and visitors would enter if he did not object, he had no reason to believe that third parties would enter to look for and seize his personal property); *People v. Brown*, 88 *Cal.App.*3d 283, 151 *Cal.Rptr.* 749, 755 (1979) (recognizing that "at least for certain purposes, a hospital room is fully under the control of the medical staff; yet for other purposes it is 'the patient's room' " because patient understands that nurses, doctors, food handlers, and others enter and exit hospital room in accordance with medical need and hospital routine); *People v. Courts*, 205 *Mich.App.* 326, 517 *N.W.*2d 785, 786 (1994) ("Although patients in hospital rooms have some legitimate expectations of privacy ... those expectations are not similar in nature to the expectations of privacy people have about homes and motel rooms.").

Although hospital rooms carry some expectation of privacy, the reasonableness of that expectation is circumscribed by the intrusion of other persons whose functions temper the "privateness" of the room. In an acute care hospital catering to medical and surgical needs of patients in single or multiple occupancy rooms, it is obvious that normal patient care functions require hospital staff to enter patients' rooms to perform routine tasks. In that setting, affording a diminished expectation of privacy in a hospital room as compared to a home sensibly accommodates the hospital administrative and medical personnel's need to have access to the patient's room. But that is not this case.

In a psychiatric institution caring for the involuntarily committed, the expectation of privacy becomes even more circumscribed. Involuntarily committed psychiatric patients are entrusted to the care and supervision of State psychiatric institutions because a court has declared those patients dangerous to themselves or to

others. *N.J.S.A.* 30:4–27.1 to 27.23; *Rule* 4:74–7. Protection of those persons from themselves, or the protection of other patients from those patients, is the responsibility of the individuals who manage the public institution. *N.J.S.A.* 30:4–27.1(a). Institutional administrative and professional staff especially must have access to the patients to supervise properly. That perforce includes living quarters.

The legislative enactment of a patient's bill of rights including a right of privacy is not inconsistent with the view that a diminished expectation of privacy must pertain in a psychiatric institution. *N.J.S.A.* 30:4–24.2(e) provides that committees in a State institution have the right to privacy and dignity and, more specifically, to have access to individual storage space for private use. The question, however, is what constitutes an appropriate level of privacy in areas other than individual storage spaces.

In my view, the privacy expectation of an involuntarily committed psychiatric patient to his room is not equivalent to the expectation of a voluntary patient in a general acute care hospital. A heightened responsibility for protection against harm is imposed on those running the psychiatric institution, and that circumstance limits the involuntarily-committed patient's reasonable expectations of privacy. Because of the need to supervise closely the behavior of involuntarily committed psychiatric patients, such patients cannot have the same expectations of privacy as patients in an acute care hospital. The "living quarters" of psychiatric patients simply are unlike those of a regular hospital patient. And, in this case, the reasonableness of any expectation of privacy also is circumscribed by the fact that the patient was allotted certain parts of the room that he could lock and thus keep private from other patients and staff, as *N.J.S.A.* 30:4–24.2(e)(4) requires. That portion of defendant's room was not searched. In my view, the hem of the curtain in his room does not have protected status. A hem is not a compartment that is meant for storage, concealment, or private discard of any type of material.

The trial court acknowledged an exceedingly diminished expectation of privacy in the room, and concluded that the search of the curtain hem in defendant's shared room was reasonable and not excessively intrusive. I find the trial court's judgment to have been based on a sound assessment of societal expectations. The Appellate Division declined to base its affirmance on that footing and proceeded to an analysis of exigency to excuse the warrant requirement. Although I respect the soundness of the trial court's reasoning, like the Appellate Division I believe there was exigency here. However, conceding some limited expectation of privacy in the shared ward room of an institutionalized psychiatric patient, that limited interest must be balanced against the State's interest in safety.

Concern for the safety of others in one's care is a traditional basis for determining exigency to exist:

> The simplest of exigent circumstances are raised in those cases where there is some apparent need to go to the aid of an individual or to seek to protect persons or property from imminent peril. Such circumstances are universally held to authorize entry onto premises and, in most cases, some limited form of search.... The most complex and fact-sensitive of all exigent circumstances cases are those where there is neither an apparent emergency risk to life or property nor the immediacy of a chase of a fleeing felon but, instead, where a combination of factors makes it probable that legitimate law enforcement goals will be thwarted if the officers were to seek an arrest or search warrant.

> [Byrnes, *New Jersey Arrest, Search & Seizure* § 11.1 at 187–88 (Gann 2001–02).]

The application of the doctrine of exigent circumstances requires a fact-sensitive, objective analysis. *State v. DeLuca*, 168 *N.J.* 626, 632, 775 *A.*2d 1284 (2001) (citing *State v. Bruzzese*, 94 *N.J.* 210, 219, 463 *A.*2d 320 (1983), *cert. denied*, 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984)). As the majority observes, an officer's belief that exigent circumstances are present must be based on "more than mere speculation." *United States v. Restrepo*, 890 *F.Supp.* 180, 206 (E.D.N.Y.1995). Here, the record is not speculative and amply supports the investigating officers' perceived need to find and secure immediately the Xanax pills. Review of the record reveals that the investigation into Hilliard's death the morning of October 8, 1997 was a collaborative effort

involving administrative staff and security of the New Jersey Department of Human Services, and Officer Koslowsky, an investigator dispatched from the Camden County Prosecutor's Office. The testimony of Officer Koslowsky and Human Service Officer Cichoski details that combined effort.

Koslowsky testified that on his arrival at the hospital Human Service officers already had secured Hilliard's and defendant's room and had brought the patients into the day room. Cichoski testified that it was the responsibility of the Human Service Police to maintain security for the institution and its patients. After meeting with the Human Services Police, Koslowsky and the Human Services officers went to Hilliard and defendant's room where they observed Hilliard's body and performed a cursory search "to assist in finding anything that would help determine why the patient had died." Cichoski was posted outside the room until Hilliard's body was removed and his personal effects secured.

At approximately 12:30 p.m., Koslowsky interviewed Fisher, one of the patients on the ward. Fisher revealed that the previous evening he had been in and out of defendant's room and that defendant attempted to sell Xanax pills to him. Fisher also informed Koslowsky that the pills were located in defendant's room, in the hem of a curtain. Koslowsky and Human Services Officer Douglas went to the room and Douglas found four pills in the curtain hem.

On direct examination, Koslowsky was asked to identify his immediate concern when he was told of the presence of drugs in defendant's room. Koslowsky responded:

> The concern would be for the recovery of that knowing that they could have been removed because a substantial period of time had taken place with the interviews that were conducted. We searched the room at 1:00 p.m. and I arrived down there at 8:45 a.m. at the police headquarters, so that was about a four[ ]hour period of time that I had been on the scene and *I realized that these drugs could have been removed by anyone,* and I wanted to get them out of there and get them in our possession because they could be removed and harm someone.

[ (emphasis added).]

Further, on cross-examination, Koslowsky also stated:

[The room] was secured originally upon my arrival, but after that I was in several different rooms conducting as you can see virtually a few hours worth of interviews. I can't be sure that anything was secure after that.

The room had in a way been released. We had removed the body. We had done that the search as far as we were going to search for any drugs that might have been involved in the death of Mr. Hilliard. But during my interviews I would not at all ever say that the room was safe and secure.

Although Cichoski testified that the door remained locked, he left his post at 10:25 a.m., and those with a key had access to the room. Koslowsky noted that a number of people could have had access to the room during the time that he was interviewing patients or prior to the discovery of Hilliard's body. Thus he was concerned not only about who had access to the room after he arrived on the scene, but also those with access prior to the discovery of Hilliard's body. Significantly, Cichoski explained that although the patients were brought to the day room and not permitted in the dorm area during the questioning the morning of October 8th, patients normally are permitted to roam and visit other patients' rooms in the dorm area, and would have been able to do so during the previous night and until the time Hilliard's body was discovered the next morning. Indeed, Fisher had told Koslowsky that on the previous evening he had been in and out of defendant's room.

The majority focuses on the fact that Koslowsky testified that after receiving Fisher's statement nothing prevented him from securing the room while he obtained a warrant. That assumes that the drugs were present in the room at the time of Fisher's statement and that securing the room would prevent removal. In hindsight that proved correct. But at the time that the Human Services representatives and the investigator from the Prosecutor's Office heard that a controlled dangerous substance allegedly was present on the ward and allegedly was in defendant's room, they did not know that the drugs were in fact there or elsewhere where other patients could get to and ingest them. In my view, Koslowsky reasonably was concerned and reasonably believed that

the Xanax pills could have been removed by the time Fisher made his statement. The Human Services officer and Koslowsky acted with dual motives. They needed to ascertain whether the pills were still in the location described by Fisher and they needed to secure the drugs. As noted, in hindsight the majority is correct when it states that had the officer secured the room and obtained a warrant, the Xanax pills would not have been removed from the curtain hem. However, if the officers had to obtain a warrant in order to learn if the drugs were in the location described by Fisher, only to discover that they had been moved, precious time would have been lost in securing the drugs and maintaining the safety of patients in the institution. In the context of administering to the needs of all patients committed to a psychiatric hospital, I would hold that exigency was present due to the need to locate the unaccounted-for Xanax pills when confronted with the sudden death of a patient.[1]

Accordingly, for the reasons expressed in Judge Wefing's well-reasoned opinion below, and as expressed here, I find ample support in the record for the Appellate Division's conclusion that exigent circumstances justified the warrantless search. I respectfully disagree with the majority's view that the evidence was too speculative to form a well-grounded or objectively reasonable basis on which to excuse the warrant requirement. I find that it was reasonable for personnel from Human Services and the Prosecutor's Office to conclude that it was necessary to search the

---

[1] Cf. Byrnes, supra, § 11:4–1(c) at 205–06. Commentator Byrnes's analysis of exigency does not consider the need to determine whether the drugs were where they were alleged to be in the institution. Of course, if the officers knew that the pills were in the location described by Fisher, they simply could have secured the room and obtained a warrant. However, the officers were concerned not only that someone could have retrieved the pills during the period of their investigation, but also prior to their arrival and before they secured the room. The record established that patients had had access to the room between the time of Fisher's nighttime visit and the discovery of Hilliard's body the next morning, and that the officers were concerned about that fact. Thus, exigent circumstances were present due to the urgent and practical need to find and secure the Xanax pills in order to accomplish patient safety.

room immediately for the pills-because of the institutional setting, because patients and staff had access to defendant's room prior to the discovery of Hilliard's body, and because the room was not secured after Hilliard's body and personal effects were removed. Indeed, Human Services Officer Douglas had an administrative responsibility to find and secure the controlled dangerous substance once he was told of its presence on the ward. The additional involvement of prosecutorial staff, because a death had occurred, does not vitiate the administrative and supervisory responsibilities of the Human Services personnel. That multiple interests may have converged does not eliminate the presence of exigent circumstances.

For the reasons expressed above, I dissent from that part of the majority's holding that orders the suppression of the Xanax pills found in the curtain hem in defendant's ward room. I concur in Section III of the majority's holding that orders suppression of defendant's statements made without the benefit of *Miranda* warnings.

*For reversal*—Justices COLEMAN, LONG, VERNIERO and ZAZZALI—4.

*For affirmance in part; reversal in part*—Chief Justice PORITZ, and Justices STEIN and LaVECCHIA—3.

*Opposed*—None.