842 A.2d 308 (2004)
367 N.J. Super. 229
R.M., Plaintiff-Appellant,
v.
The NORTHERN REGIONAL UNIT, Officer B. Singletary, Officer Torres, Sgt. Collins, the New Jersey Department of Corrections and the State of New Jersey, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted January 28, 2004.
Decided March 3, 2004.
Gold, Albanese & Barletti, attorneys for appellant (James N. Barletti, of counsel and on the brief).
Peter C. Harvey, Attorney General of New Jersey, attorney for respondents (Michael *309 J. Haas, Assistant Attorney General, of counsel; Mary Beth Wood, Deputy Attorney General, and Victoria L. Kuhn, Deputy Attorney General, on the brief).
Before Judges KING, LINTNER and REISNER.
The opinion of the court was delivered by REISNER, J.A.D.
Appellant, who has been civilly committed to the Department of Corrections (DOC) Northern Regional Unit (NRU) as a sexually violent predator pursuant to N.J.S.A. 30:4-27.24 to -27.38, challenges as unconstitutional a DOC policy that requires periodic random searches of the NRU residents' rooms. We hold that the policy is constitutional.

I
On May 28, 2002, R.M. filed a verified complaint and order to show cause in the Law Division asserting that his constitutional and statutory rights were violated by a March 11, 2000, warrantless search of his room and locked footlocker at the Northern Regional Unit (NRU), a Department of Corrections (DOC) facility in Kearney, Hudson County. The NRU is used exclusively to house residents civilly committed pursuant to the Sexually Violent Predators Act (SVPA), which provides that such units must be "secure" facilities and must be operated by the DOC. N.J.S.A. 30:4-27.26, -27.34.
R.M. alleged that the search was conducted pursuant to a DOC policy that required staff to randomly search at least two residents' rooms per day during the first and second shift. He also alleged that his room had been searched previously pursuant to the policy. He sought a declaration that the policy was unconstitutional. He also sought injunctive relief and damages.
The State moved for summary judgment. Judge D'Italia, correctly perceiving the lawsuit as a challenge to the policy of a State administrative agency, ordered that the matter be transferred to this court pursuant to R. 2:2-3 and denied the summary judgment motion for lack of trial court jurisdiction.

II
Based upon the record before Judge D'Italia, we conclude that the facts are not in dispute and that the record is sufficient to permit us to decide this case as an appeal from the final action or rule of a State administrative agency. R. 2:2-3(a)(2).
On August 24, 2001, R.M. was committed to the Special Treatment Unit (STU) at the NRU as a sexually violent predator in need of involuntary civil commitment.[1] By statute, the DOC is responsible for the operation of the facility, N.J.S.A. 30:4-27.34(a), and it is staffed by DOC corrections officers. The Division of Mental Health Services in the Department of Human Services (DHS) provides treatment for persons committed to the STU. N.J.S.A. 30:4-27.34(b).
*310 R.M. had been a resident of the STU since December 20, 2000. He lived in a room that had been assigned for his exclusive use. The room contained his personal and legal files and a footlocker which he used to store his clothing. He was able to lock the room from the inside and could also lock it from the outside when he left.
On different occasions, the room had been searched by Corrections Officers Singletary, Torres, and other officers. R.M. alleged in his certification that his room was searched by Officer Singletary on March 11, 2002, with R.M. present. On one occasion when Officer Torres conducted a search, the officer examined R.M.'s files, required him to open a sealed envelope that contained postage stamps, dumped out his laundry bag and examined his clothes. R.M. was also required to open the combination lock on his footlocker, so the officer could search the locker.
When R.M. questioned the authority for the searches, he was shown a copy of the "Resident Handbook" dated March 22, 2000, which stated: "Searches of rooms and the unit will be conducted regularly and are at the discretion of the Ranking DOC Officer or Supervisor." The NRU's room search policy is also set forth in Custody Directive 6, effective August 1, 1999. The directive, which refers to residents' rooms as "cells," sets forth the following policy for cell and "area" frisks:
CELL AND AREA FRISKS
During the 06:00 to 14:00 and 14:00 to 22:00 shifts, each Housing Unit Officer shall frisk a minimum of three (3) cells per shift. All cells searched shall be recorded in the housing unit log book, on the daily inspection form. All cell searches are to be performed and recorded to ensure that repetition is not established and that a pattern is not created. All pipe chases are to be inspected for contraband by the 14:00 to 22:00 Housing Unit Officers. Conformation [sic] of the pipe chase inspection shall be recorded on the daily housing unit inspection form.
The 22:00 to 06:00 Housing Unit Officers shall inspect all common areas-dayroom, interview rooms, showers, sallyports, and resident accessible stairways that are under the officers [sic] area of responsibility. All areas searched shall be recorded on the daily inspection form.
Residents are required to be present during the searches, unless they become uncooperative, in which case they are removed.
In addition to advising the residents that their rooms were subject to routine searches, the Resident Handbook puts residents on notice of other restrictions on their activities and on their expectations of privacy in the facility. Residents are prohibited from entering one another's rooms, even if they are invited. In addition to room searches, residents are subject to "pat searches" before and after any outside trips, and after any contact with visitors. Strip searches are conducted if there is probable cause to believe that a resident is concealing a weapon "or other object that will place the staff or the facility at great risk." While residents are allowed to have word processors they are put on notice that the word processors' memory is subject to search by the staff.
Grace Rogers, administrator of the Adult Diagnostic and Treatment Center in Avenel and the STUs at Kearny and Woodbridge, certified that "[t]he purpose of the [search] policy is to remove from the possession of the residents any contraband that is either counter-therapeutic or would place the safety and security of the staff, residents or the public at risk." She also attested that the searches "have proven to be essential in maintaining the *311 safe and secure operation of the STU and have uncovered many dangerous forms of contraband, including shanks, lighters, scissors, tweezers, screws, razors, hooch, marijuana, cocaine, altered wires, tattoo machine [sic] and pornography." Glen Ferguson, the clinical director of the STU, also certified that the searches were necessary to locate inappropriate materials that were counter-therapeutic, including pornography and pictures of residents' victims.
The record reflects that the search policy at issue in this case is not unique to State facilities housing civilly committed sexual predators. The Anne Klein Forensic Center, the State's forensic psychiatric hospital, has a similar policy that all "patient rooms" are searched at least two times per week and additional searches may be ordered if there is a suspicion that a patient has contraband. Likewise, in State v. Stott, 171 N.J. 343, 349, 794 A.2d 120 (2002), discussed below, the Court noted that at the Ancora State Psychiatric Hospital, "[h]ospital staff personnel regularly search the patients' rooms, including their wardrobes."

III
R.M. contends that the random, warrantless searches required by the STU policy are unconstitutional. His argument relies primarily on State v. Stott, supra, 171 N.J. at 356-64, 794 A.2d 120, in which the Supreme Court held that the warrantless police search of a psychiatric patient's hospital room violated the patient's Fourth Amendment right to be free of unreasonable searches and seizures. We conclude that his reliance on Stott is misplaced.
In Stott, police searched a psychiatric patient's room specifically for the purpose of finding evidence of illegal drug use, to be used in criminally prosecuting the patient. Id. at 350, 794 A.2d 120. The Court held that because the patient had a Fourth Amendment-protected expectation of privacy against law enforcement searches of his hospital room, police should have obtained a warrant before conducting the search and therefore "the fruits of the [warrantless] search cannot be used in a criminal prosecution." Id. at 362, 794 A.2d 120. However, the Court also cautioned that "[o]ur disposition is not to be construed as prohibiting all warrantless searches conducted in a hospital setting... whether a patient's expectation of privacy is reasonable so as to trigger constitutional safeguards depends on many factors." Id. Finding that, although confined, defendant retained a privacy interest in his hospital room, the Court reasoned that
Defendant was committed involuntarily to a State-run hospital because of illness and not as part of a criminal sentence. In that position, defendant cannot be denied his right to be free of unreasonable searches merely because he does not "own" his surroundings.

[Stott, supra, 171 N.J. at 357, 794 A.2d 120]
That interest protected the patient against law enforcement searches of his room aimed at discovering criminal evidence. The Court, however, having earlier noted that "[h]ospital staff personnel regularly search the patients' rooms, including their wardrobes," id. at 349, 794 A.2d 120, carefully distinguished those searches from the criminal searches at issue in Stott.
The Court recognized that with respect to searches undertaken for administrative rather than law enforcement purposes in a psychiatric hospital "[w]e would expect doctors, nurses, and other hospital personnel to inspect all areas of such a facility to ensure that patients are not in a position to harm either themselves or others." Id. at 361-62, 794 A.2d 120. That concern *312 applies to this case with even greater force.
R.M. has been civilly committed as a sexually violent predator, in a facility exclusively occupied by patients who have been similarly committed. This factor heightens the State's legitimate interest in conducting routine searches. For the protection of staff and other patients, and to further the therapeutic goals of the facility, the STU administration has a need to thoroughly inspect the patients' living areas to ensure that they do not have contraband including but not limited to drugs, pornography, weapons or means of escape.
We conclude that the routine security searches conducted at the STU are distinguishable from the targeted police search disapproved in Stott. The issue of whether the Fourth Amendment protects against a particular governmental intrusion turns on whether the person claiming the protection can show that a "justifiable," "reasonable," or "legitimate expectation of privacy" has been invaded. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979); State v. Marshall, 123 N.J. 1, 66-67, 586 A.2d 85 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993). To warrant the protection of the Fourth Amendment, the expectation of privacy must be "one that society is prepared to recognize as `reasonable.'" Katz v. U.S., 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967); Stott, supra, 171 N.J. at 354, 794 A.2d 120. Following Stott, we conclude that R.M. has no legitimate expectation of privacy from the kind of routine, non-targeted searches at issue here.
The staff of the STU are no less entitled than employees of Ancora and other psychiatric hospitals to the security afforded by inspections to "ensure the patients are not in a position to harm either themselves or others." Id. at 362, 794 A.2d 120. A patient in a psychiatric hospital cannot expect the hospital staff to relinquish control over the security of the patients' rooms. In the same manner, R.M. cannot expect the staff at the STU to forego measures that allow them to exercise security control over the area of his room. The affidavits submitted by the STU administrator and clinical director demonstrate a genuine threat from the residents' possession of contraband capable of causing physical harm or, at the very least, impeding the important therapeutic purposes of the STU program.
We note that the Washington Court of Appeals also rejected a Fourth Amendment challenge to unannounced room searches at a sex offender facility. Matter of Paschke, 80 Wash.App. 439, 909 P.2d 1328, 1332 (1996). In Paschke, the court concluded that the facility "has a duty to provide a safe environment for its confinees. To do so, it must have the authority to take immediate action to search [residents' rooms without prior notice]...." Id.

IV
In summary, focusing our holding on the issue addressed as dicta in Stott, we conclude that the staff of a State facility for civilly committed sexual predators may conduct warrantless routine searches for security purposes. We recognize that targeted searches directed by non-institutional law enforcement personnel as part of a criminal investigation would ordinarily require a warrant; however, the searches challenged by R.M. are routine untargeted searches conducted to secure the safety of residents and staff and further the therapeutic goals of the STU. R.M. and his fellow patients have no legitimate expectation of privacy which would constitutionally preclude warrantless searches of this type.
*313 We therefore affirm the challenged policy of the Department of Corrections.
Affirmed.
NOTES
[1] A "sexually violent predator" is defined in the SVPA as

a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.
[N.J.S.A. 30:4-27.26.]