NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0022-18T2
                          A-2586-18T2

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

MARK JACKSON,

     Defendant-Respondent.

<div style="border:1px solid black; display:inline-block; padding:10px; text-align:center">

**APPROVED FOR PUBLICATION**

**July 19, 2019**

**APPELLATE DIVISION**

</div>

_____

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

JAMIE MONROE,
KIMBERLEY MORGENBESSER,
ELIZABETH FUSCO-BRYANT,
LARRY EMBRY, and KELLY
EMBRY,

     Defendants-Respondents.

_____

Argued June 5, 2019 – Decided July 19, 2019

Before Judges Alvarez, Reisner, and Mawla.

On appeal from interlocutory orders of the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 18-04-0555 and 18-05-0834.

David Michael Liston, Assistant Prosecutor, argued the cause for appellant (Andrew C. Carey, Middlesex County Prosecutor, attorney; David Michael Liston, and Susan Lynn Berkow, Special Assistant Prosecutor, of counsel and on the briefs).

Tamar Yael Lerer, Assistant Deputy Public Defender, argued the cause for respondents (Joseph E. Krakora, Public Defender, attorney; Tamar Yael Lerer, of counsel and on the briefs).

Sarah C. Hunt, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Sarah C. Hunt, of counsel and on the brief).

The American Civil Liberties Union of New Jersey Foundation, attorney for amicus curiae The American Civil Liberties Union of New Jersey (Liza F. Weisberg, Alexander R. Shalom, and Jeanne M. LoCicero, on the brief).

Association of Criminal Defense Lawyers of New Jersey, attorney for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Sharon Bittner Kean, on the brief).

Hyland Levin Shapiro LLP, attorneys for amicus curiae The National Association of Criminal Defense Lawyers (Daniella Gordon, on the brief).

The opinion of the court was delivered by

ALVAREZ, P.J.A.D.

On leave granted, the Middlesex County Prosecutor's Office appeals from orders suppressing the content of inmate telephone calls, pivotal in two unrelated criminal matters, recorded by the Essex County Correctional Facility[1] and the Middlesex County Department of Adult Corrections.[2] The State served grand jury subpoenas to obtain the recordings. We consolidate the matters for decision and reverse. We hold that the inmates had no reasonable expectation of privacy in the recorded phone calls at issue here, and the Prosecutor's Office was authorized to obtain the recordings without a search warrant, a communications data warrant, or a wiretap order.

## JAIL POLICY TOWARDS INMATE PHONE CALLS

The Essex County Correctional Facility permits inmates to make unmonitored and unrecorded telephone calls only to legal counsel and Internal Affairs; all others are monitored and recorded. Inmates are informed at the beginning of each phone call that the call may be recorded or monitored. In addition, the Inmate Telephone ID Number Release Form provides in relevant part: "I understand and agree that telephone calls are subject to monitoring,

---

[1] Defendant Mark Jackson was being held on separate charges at the Essex County Correctional Facility at the time relevant to these events.
[2] Defendant Jamie Monroe was housed at the Middlesex County Department of Adult Corrections.

recording, and may be intercepted or divulged." Defendant Mark Jackson signed that form.

Inmates at the Middlesex County Department of Adult Corrections are provided with a pamphlet titled "Correction Center Inmate Guidelines" stating: "[t]elephone calls may be monitored and recorded except calls to the Internal Affairs Unit and legal telephone calls." The Guidelines warn that "[a]ny abuse of the telephone . . . will result in disciplinary action, and can lead to prosecution." At the beginning of each monitored call, the inmate hears: "[t]his call may be recorded or monitored."

## MARK JACKSON

Jackson was charged in a superseding indictment with third-degree receiving stolen property, N.J.S.A. 2C:20-7, and third-degree witness tampering, N.J.S.A. 2C:28-5(a). The original offense arose from defendant's alleged possession of approximately $2600 in change stolen from a laundromat. Jackson's mother notified the authorities about the coins, which Jackson brought to her apartment, but asked that she not be revealed as the source of the information. Some months after Jackson's arrest, his attorney advised the Prosecutor's Office Jackson's mother had written a letter indicating that she could not testify as to who left the coins in her home because she "did not witness that[,]" and in any event, "[Jackson] was not even in town."

The grand jury subpoena directed to the Essex County facility requested the recordings of all of Jackson's calls to his mother's number. Once the State received the recordings, the original indictment was superseded to include the witness tampering count.

After hearing argument, the Law Division judge orally granted Jackson's motion to suppress the evidence obtained through the grand jury subpoena. On July 16, 2018, he issued a written decision and order granting the motion, and dismissing the witness tampering charge. The judge also ruled the calls could not be used to impeach witnesses.

### JAMIE MONROE, KIMBERLEY MORGENBESSER, ELIZABETH FUSCO-BRYANT, LARRY EMBRY, and KELLY EMBRY

While being processed at a police station for pending drug and firearms offenses, defendant Jamie Monroe called a person also suspected of involvement in drug distribution. The Prosecutor's Office thereafter served a grand jury subpoena on the Middlesex County facility for the production of recordings of all calls made to the suspected drug dealer's number. Upon review, an investigating officer learned that Monroe had called that number, as well as several others, to obtain assistance in laundering money to post bail. These persons, identified from the calls, included Kimberly Morgenbesser, defendant's girlfriend; Larry Embry, a bail bond agent; Kelly Embry, another officer in the bail bond company; and Elizabeth Fusco-Bryant, Morgenbesser's

aunt. During the conversations, Monroe instructed the other defendants on the mechanics of posting money for bail so as to survive a "bail source hearing."

Following the production of the tapes, Monroe, Morgenbesser, Fusco-Bryant, and Larry Embry were charged with third-degree conspiracy to commit financial facilitation of criminal activity, N.J.S.A. 2C:5-2 (count one); and third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25 (count two). Along with Kelly Embry, all were charged with fourth-degree tampering, N.J.S.A. 2C:28-6(2) (count three); and third-degree perjury, N.J.S.A. 2C:28-1 (count four). In separate counts, the Embrys were charged with second-degree conspiracy to commit misconduct by a corporate official, N.J.S.A. 2C:5-2 (count five); and second-degree misconduct by a corporate official, N.J.S.A. 2C:21-9(c) (count six). Fusco-Bryant was charged with fourth-degree hindering one's own apprehension, N.J.S.A. 2C:29-3(b)(4) (count seven); third-degree hindering the apprehension of another, N.J.S.A. 2C:29-3(a)(7) (count eight); and second-degree hindering the apprehension of another, N.J.S.A. 2C:29-3(a)(5) (count nine). The defendants' motions to suppress were granted on January 7, 2019, stated by the same trial judge who decided the Jackson matter and for the same reasons.

A-0022-18T2

## THE TRIAL JUDGE'S DECISIONS GRANTING THE MOTIONS

The Law Division judge found that the recorded calls had to be suppressed because the prosecutor's grand jury subpoena of the recordings from the correctional facilities violated the New Jersey Wiretapping and Electronic Surveillance Control Act (the Act), N.J.S.A. 2A:156A-1 to -37, Title III of the Federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, and Article I Paragraph 7 of the New Jersey Constitution. In his view, a warrant or a separate wiretap order was necessary even though the Act authorizes correctional facilities to monitor inmate calls. The judge further opined that an inmate's consent, evidenced by his or her undisputed knowledge the calls would be recorded and monitored, was invalid because it was the product of an imbalance in power between the corrections facility and inmates. Sensitive to the intrusion into an individual's privacy interest that results from the recording, and its subsequent use in prosecution, the judge suppressed the material in both cases.

In <u>Jackson</u>, the State alleges the following points of error for our consideration:

> POINT I
> DEFENDANT'S RECORDED JAIL CALLS ARE NOT INTERCEPTS FOR PURPOSES OF THE WIRETAP STATUTE; DEFENDANT HAD NO REASONABLE EXPECTATION OF PRIVACY IN

CALLS THAT HE GAVE EXPLICIT CONSENT TO
LAW ENFORCEMENT TO RECORD.

A. The Trial Court Misinterpreted the "New
Jersey Wiretapping and Electronic Surveillance
Control Act," N.J.S.A. 2A:156A-1 to -37 (the
"Act"), as Requiring the State to Obtain a Court
Order Before Acquiring Recorded Phone Calls
Made by Defendant While Incarcerated.

B. A Grand-Jury Subpoena Was Sufficient
and a Warrant Was Not Required for
Defendant's Recorded Telephone Calls Because
Defendant Consented to the Recording and
Divulgence of Those Calls and Had No
Reasonable Expectation of Privacy in Them.

POINT II
THE TRIAL COURT COMPOUNDED ITS ERROR
AND ABUSED ITS DISCRETION IN RULING
THAT THE SUPPRESSED TELEPHONE CALLS
COULD NOT BE USED FOR IMPEACHMENT AT
TRIAL AND DISMISSING A COUNT OF THE
INDICTMENT WITHOUT A PROPER HEARING.

In Monroe, the State contends the following warrant reversal:

POINT I
RECORDED JAIL CALLS ARE NOT INTERCEPTS
FOR PURPOSES OF THE WIRETAP STATUTE,
AND DEFENDANT MONROE HAD NO
REASONABLE EXPECTATION OF PRIVACY IN
CALLS THAT HE KNEW MAY BE RECORDED BY
LAW ENFORCEMENT.

A. The Trial Court Misinterpreted the "New
Jersey Wiretapping and Electronic Surveillance
Control Act," N.J.S.A. 2A:156A-1 to -37 (the
"Act"), as Requiring the State to Obtain a Court

A-0022-18T2

Order Before Acquiring Recorded Phone Calls Made by a Defendant While Incarcerated.

B. A Grand-Jury Subpoena Was Sufficient and a Warrant Was Not Required for Monroe's Recorded Telephone Calls Because Monroe Consented to the Recording and Divulgence of Those Calls and Had No Reasonable Expectation of Privacy in Them.

POINT II
EVEN IF THIS COURT AFFIRMS THE TRIAL COURT'S ORDER GRANTING THE SUPPRESSION MOTION, THE SUPPRESSED TELEPHONE CALLS SHOULD REMAIN AVAILABLE TO USE FOR IMPEACHMENT AT TRIAL.

I.

A grand jury subpoena is a "proper" investigative tool. In re Subpoena Duces Tecum, 214 N.J. 147, 166-70 (2013). Such subpoenas are permissible even if the grand jury is not sitting on the return date of the subpoena, or is not the same body which issued it. State v. Hilltop Private Nursing Home, Inc., 177 N.J. Super. 377, 391 (App. Div. 1981). In other words, a prosecutor may issue a subpoena without the grand jury's express permission, so long as the material is returnable on a day when they are sitting. Ibid. So long as the material is presented to them, it is not then an "invalid office subpoena[.]" Id. at 395.

To summarize, the State contends that its receipt of the recorded telephone conversations falls outside the scope of the Act, Title III, the Fourth

Amendment, and Article I, Paragraph 7 of the New Jersey Constitution. The State also contends that a grand jury subpoena sufficed as the process through which to obtain the recordings because doing so was nothing more than the sharing between law enforcement agencies of lawfully obtained information for lawful purposes. Additionally, the State argues that the repeated warnings regarding monitoring and recording of jail phone calls meant inmates consented to the sharing of the calls. The State further argues that even if not available for direct use as part of its case in chief, the recordings should be found to be available for impeachment purposes and that the second count of Jackson's indictment should not have been dismissed.

The Attorney General's Office, which filed an amicus brief, also asserts the trial judge erred since the prosecutor's receipt of the materials did not implicate the Act. The Attorney General further avers that inmates who are informed that monitoring is a condition for the use of the facility's phone have no reasonable expectation of privacy in the calls.

The defendants in both appeals respond that the manner in which the calls were obtained violated the Act, Title III, the Fourth Amendment, and Article I, Paragraph 7 of New Jersey's Constitution. They posit that inmates have a reasonable expectation of privacy in their calls, violated by the Prosecutor's Office search and seizure of the contents.

10

Amicus curiae American Civil Liberties Union (ACLU), relying on State v. Stott, 171 N.J. 343 (2002), argues that an inmate's consent to recordings designed to advance institutional security does not constitute consent to release the recordings for other purposes. The ACLU contends that disclosure by the correctional facility to the Prosecutor's Office violated not just the Fourth Amendment, but the Fifth Amendment as well, because disclosure to others of details found in even seemingly innocuous conversations might undermine a person's criminal defense.

## II.

The facts underlying the motions to suppress are undisputed. Thus we are left only with questions of law, which we decide de novo. State v. Boone, 232 N.J. 417, 426 (2017). We conclude that the Act does not apply.

The Act and Title III bar the interception of wire communications, such as phone calls, absent the issuance of a wiretap order or communications data warrant. N.J.S.A. 2A:156A-3(a); 18 U.S.C. § 2511(1). New Jersey's law is more restrictive than federal precedents. In re Application of State for Commc'ns Data Warrants to Obtain the Contents of Stored Commc'ns from Twitter, Inc., 448 N.J. Super. 471, 479-80 (App. Div. 2017) ("C.D.W.").

A wire communication is:

> any aural transfer made . . . through the use of
> facilities for the transmission of communications by

the aid of wire, cable or other like connection between the point of origin and the point of reception, including the use of such connection in a switching station, furnished or operated by any person engaged in providing or operating such facilities for the transmission of intrastate, interstate or foreign communication. "Wire communication" includes any electronic storage of such communication, and the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit[.]

[N.J.S.A. 2A:156A-2(a) (emphasis added).]

Further, the Act defines aural transfer as a "transfer containing the human voice at any point between and including the point of origin and the point of reception[.]" C.D.W., 448 N.J. Super. at 475 (quoting N.J.S.A. 2A:156A-2(t)). "The Act defines an 'oral communication' as 'any . . . utter[ance] by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation[.]'" Ibid. (first alteration in original) (quoting N.J.S.A. 2A:156A-2(b)).

Our courts strictly interpret and enforce the Act. State v. Worthy, 141 N.J. 368, 379-80 (1995). Because the impetus for adoption of our Act was the earlier adoption of the federal law, when rendering decisions regarding wiretapping and related issues, we at times turn to federal decisions interpreting Title III. State v. Ates, 217 N.J. 253, 269 (2014). Failure to

12

comply with the Act, of course, results in the suppression of the seized evidence. Worthy, 141 N.J. at 380-81; N.J.S.A. 2A:156A-21.

Telephone equipment used by law enforcement officers in the ordinary course of their duties falls outside the scope of the Act. See State v. Fornino, 223 N.J. Super. 531, 544-45 (1988). In that case, which concerned prison recordings of inmate phone calls, Judge Skillman held that the exemption specifically includes corrections officers. Ibid. The language that creates the N.J.S.A. 2A:156A-2(d)(1) and 18 U.S.C. § 2510(5)(a)(ii) exception "appl[ies] to telephone equipment used by law enforcement officers in the ordinary course of their duties, regardless of whether the monitoring on a particular occasion is random or is done by an officer who regularly performs that duty." Id. at 545.

As Judge Skillman also said, "it would be unreasonable to construe the federal and state acts as requiring court authorization before telephone equipment regularly used to monitor calls on inmate telephones can be activated based on specific information that a telephone will be used for a prohibited purpose." Id. at 546. Thus, the Act and Title III's proscription against the general monitoring of phone calls, absent an order or warrant, simply excludes inmate phone calls recorded in prison facilities. Id. at 544-45. Federal cases are in accord. See, e.g., United States v. Lewis, 406 F.3d 11, 16-

17 (1st Cir. 2005); United States v. Hammond, 286 F.3d 189, 192 (4th Cir. 2002); United States v. Friedman, 300 F.3d 111, 122-23 (2d Cir. 2002); Smith v. Dep't of Justice, 251 F.3d 1047, 1049 (D.C. Cir. 2001); United States v. Van Poyck, 77 F.3d 285, 291-92 (9th Cir. 1996); United States v. Feekes, 879 F.2d 1562, 1565-66 (7th Cir. 1989); United States v. Paul, 614 F.2d 115, 116-17 (6th Cir. 1980).

Since the recording of such calls is not an interception within the Act or Title III's purview, logically, sharing the information with another law enforcement agency under the authority of a grand jury subpoena is not a violation of the Act. The information—the recording—was not an interception. A grand jury subpoena is a proper investigative tool for the sharing of lawfully obtained information. If creating the recording was not an interception, another law enforcement agency's receipt of it is not an interception either.

The circumstances here are no different than when one law enforcement agency shares information relevant to an ongoing investigation with another law enforcement agency in order to assist in the apprehension of a suspect. See Phila. Yearly Mtg. of Religious Soc'y of Friends v. Tate, 519 F.2d 1335, 1337-38 (3d Cir. 1975) (the sharing of information among law enforcement agencies for a legitimate law enforcement purpose does not constitute a

A-0022-18T2

constitutional violation in and of itself and is only impermissible if the initial gathering of that information was unconstitutional); see also State v. Soto, 340 N.J. Super. 47, 56-57 (App. Div. 2001); Commonwealth v. Green, 581 A.2d 544, 548-49 (Pa. 1990). No applicable law requires the Prosecutor's Office to have done more than it did in this case. See, e.g., Lewis, 406 F.3d at 16-17; Hammond, 286 F.3d at 192-93; Smith, 251 F.3d at 1049; In re High Fructose Corn Syrup Antitrust Litig., 216 F.3d 621, 624-26 (7th Cir. 2000).

III.

The analogy to the inter-agency sharing of intelligence is strengthened by the fact that the Act, like Title III, expressly authorizes law enforcement agencies to do so:

> Any investigative or law enforcement officer or other person who, by any means authorized by this act, has obtained knowledge of the contents of any wire, electronic or oral communication, or evidence derived therefrom, may disclose or use such contents or evidence to investigative or law enforcement officers of this or another state, any of its political subdivisions, or of the United States to the extent that such disclosure or use is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.
>
> [N.J.S.A. 2A:156A-17(a); accord 18 U.S.C. § 2517(1).]

A-0022-18T2

The use made by the Prosecutor's Office of these recordings was "appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." N.J.S.A. 2A:156A-17(a).

Therefore if, for the sake of argument only, we were to find the Act and Title III applied, sharing the information inter-agency was nonetheless lawful. A corrections facility cannot be limited to sharing a recorded call only when it relates to a planned escape or an assault by an inmate or other illegal activity occurring within the confines of the jail or related to institutional security. The language in the Act allows the disclosure or use when "appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." N.J.S.A. 2A:156A-17(a). The jail authorities were in the proper performance of their official duties when they recorded the calls, and the Prosecutor's Office was properly performing its official duties by conducting the investigation.

IV.

Providing the recordings made by the correctional facility to the Prosecutor's Office was not a separate interception. Currently, the Act includes electronic storage in the definition of wire communications, although Title III no longer does. C.D.W., 448 N.J. Super. at 482, n.9; N.J.S.A. 2A:156A-2(a). Electronic storage, however, is defined as:

A-0022-18T2

(1)     Any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and

(2)     Any storage of such communication by an electronic communication service for purpose of backup protection of the communication[.]

[N.J.S.A.  2A:156A-2(q);  accord  18  U.S.C.  § 2510(17).]

The recorded phone conversations do not fall within either definition of electronic storage.  They were not "temporary, intermediate storage."  See United States v. Councilman, 418 F.3d 67, 81 (1st Cir. 2005).  They were not "backup protection" preserving the communication.  See Theofel v. Farey-Jones, 359 F.3d 1066, 1075 (9th Cir. 2004).  Therefore, receipt by the Prosecutor's Office was not a separate interception because the phone calls were not in electronic storage and were not a wire communication.  "No new interception occurs when a person listens to or copies the communication that has already been captured or redirected."  Noel v. Hall, 568 F.3d 743, 749 (9th Cir. 2009).  "[A] replaying of tapes containing recorded phone conversations does not amount to a new interception[.]"  Ibid;  see also Hammond, 286 F.3d at 193;  Reynolds v. Spears, 93 F.3d 428, 432-33 (8th Cir. 1996); United States v. Shields, 675 F.2d 1152, 1156-57 (11th Cir. 1982); United States v. Turk, 526 F.2d 654, 657-59 (5th Cir. 1976).

## V.

A reasonable expectation of privacy arises under the Fourth Amendment when the defendant demonstrates he had an actual, subjective expectation of privacy and the expectation is "one that society is prepared to recognize as reasonable." State v. Evers, 175 N.J. 355, 369 (2003) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). Only when the expectation is objectively reasonable will it garner Fourth Amendment protection and the protection of Article I, Paragraph 7. Id. at 369-70. Common sense limits those expectations in a jail setting.

An inmate's privacy entitlements must yield to the institution's responsibility to preserve the health and safety of the prison population, for example. Hudson v. Palmer, 468 U.S. 517, 527-28 (1984); In re Rules Adoption Regarding Inmate Mail to Attorneys, Pub. Officials, & News Media Representatives, 120 N.J. 137, 146-47 (1990). The public's need for such facilities to maintain a safe and orderly environment is the same whether the inmate is being held before or after conviction. See United States v. Hearst, 563 F.2d 1331, 1345 n.11 (9th Cir. 1977).

Correctional facilities also have a legitimate security interest in preventing inmates from planning or participating in crimes that will take place outside the facilities' walls. Protecting public safety and preventing

A-0022-18T2

obstruction of justice are among the recognized purposes of pretrial detention and post-conviction incarceration. See N.J.S.A. 2A:162-18(a)(1); N.J.S.A. 2C:44-1(a)(3).

In the balance, the correctional facilities' interest in maintaining institutional security and public safety outweighs the right to privacy asserted here. Furthermore, if an inmate knows he or she is being monitored and recorded when speaking on the phone, it is unreasonable to conclude either that the inmate retains a reasonable expectation of privacy, or that the inmate's loss of privacy should be limited to the one law enforcement agency—the correctional facility—that is recording the conversation.

Nor is it reasonable to limit the ability to divulge the information to prosecutors to crimes related to prison security. It seems self-evident that the logical conclusion a person would reach after being repeatedly warned that calls are being recorded and monitored is that others will hear those calls. In a prison setting, there is a reasonable expectation that law enforcement will hear the calls. Whether about crimes having an immediate impact on prison security or otherwise, no reasonable expectation of privacy existed.

Stott is inapposite to these cases. In Stott, the warrantless seizure of evidence regarding drug distribution was made in a state-operated hospital room. 171 N.J. at 350-51. That is far removed from an inmate using a prison

telephone. The Court likened the expectation of privacy in a hospital room to a home and stated that, "[e]ven when a patient consents to the presence of hospital employees in the room, it has been held that such consent does not waive the otherwise reasonable expectation of privacy from police intrusion that one may enjoy in a hospital room." Id. at 356 (citation omitted). Clearly, a hospital patient's privacy interests are regularly breached by hospital staff necessary for a patient's care. But it would not be reasonable to deem that a patient, who must accept those breaches of his privacy by the medical profession, has thereby waived his constitutional protections from unwarranted searches and seizures by police.

In this regard, a prison telephone call is not analogous to a hospital room, where individuals may be committed because of an illness and "not as part of a criminal sentence." Id. at 357. A person's presence and expectations in the two settings are patently different. Defendants had no reasonable expectation of privacy in their calls. There was no Fourth Amendment or Article I, Paragraph 7 violation.

## VI.

One final point requires brief discussion. Ordinarily we would not reach it because reversal of the suppression orders would make it unnecessary, but the issue is of some importance to the parties. Even when material is obtained

contrary to the wiretap laws, and is suppressed, there are circumstances in which it can be used for impeachment purposes. As an example, those committing affirmative perjury cannot obtain the Act's protection because such distortion of the trial process will not be countenanced. See Estate of Lagano v. Bergen Cty. Prosecutor's Office, 454 N.J. Super. 59, 78-79 (App. Div. 2018). Federal precedent is in accord. See, e.g., United States v. Simels, 654 F.3d 161, 169-70 (2d Cir. 2011) (citing United States v. Baftiri, 263 F.3d 856, 857-58 (8th Cir. 2001)); United States v. Echavarria-Olarte, 904 F.2d 1391, 1397 (9th Cir. 1990); United States v. Vest, 813 F.2d 477, 484 (1st Cir. 1987); United States v. Caron, 474 F.2d 506, 508-09 (5th Cir. 1973); Culbertson v. Culbertson, 143 F.3d 825, 827-28 (4th Cir. 1998); Jacks v. Duckworth, 651 F.2d 480, 483-85 (7th Cir. 1981).

Even where evidence is obtained in violation of the Fifth Amendment, it can be used for impeachment so long as the unlawfully obtained statement bears indicia that it was freely and voluntarily given, without compelling influence, and is thus reliable. State v. Maltese, 222 N.J. 525, 550-51 (2015).[3]

---

[3] We do not address the ACLU's additional argument premised on the Fifth Amendment, because an amicus curiae may not raise new issues on appeal. R. 1:13-9; State v. J.R., 227 N.J. 393, 421 (2017). Further, these appeals do not present facts pertinent to the ACLU's Fifth Amendment issue.

The suppression orders are reversed and the cases remanded. The indictment count charging witness tampering is reinstated. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0022-18T2