**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0931-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JEFFREY T. HARLEY,
a/k/a WILLIAM MELLY,

     Defendant-Appellant.

_____

Argued September 30, 2024.
Reargued December 9, 2024 – Remanded December 17, 2024.
Reargued May 5, 2025 – Decided May 21, 2025

Before Judges Sabatino, Gummer, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 16-11-1411.

Daniel S. Rockoff, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Daniel S. Rockoff, of counsel and on the briefs).

Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County

Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the briefs).

PER CURIAM

Defendant Jeffrey Harley appeals his conviction of the murder of an elderly woman and other offenses, and his corresponding sentence. We reverse the conviction because investigating police unconstitutionally obtained incriminating statements from defendant during what we conclude was a custodial interrogation that required Miranda[1] warnings. The statements were admitted at trial and prejudicially emphasized during the State's closing argument. We consequently order a new trial.

For the sake of completeness, we reject defendant's separate argument that the court erred in admitting identification testimony. Lastly, if we had not set aside the conviction, the case would need to be remanded for resentencing.

I.

On Saturday, February 6, 2016, eighty-one-year-old Lucila Cardenas Viejo was beaten and stabbed to death in her apartment on Lexington Avenue in Jersey City. Her body was discovered the following day.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

<u>The Victim's Residence</u>

Detective Matthew Kickey of the Hudson County Prosecutor's Office ("HCPO") described Viejo's residence as being within a two-story, two-family house. The residence had "an iron gate on the outside [and] one set of stairs that led to the main front door of the building. Upon entering the main entrance . . . was a vestibule area with a secondary doorway."

According to Kickey, in the entryway of that secondary doorway, there was a set of stairs that went up to the second-floor residence. In addition, there was a hallway off to the right, which was the hallway that led to Viejo's first-floor residence.

<u>The Victim's Son Discovers Her Body on February 7</u>

On the morning of Sunday, February 7, 2016, Viejo's upstairs tenant called one of Viejo's sons, Armando Solorzano ("Armando"[2]), and alerted him that something had happened at Viejo's house. Armando arrived there at approximately 10:25 a.m. Among other things, he first noticed blood stains on the handrails leading to his mother's home and on the doorknob and around the frame of the main front door.

---

[2] We use the son's first name consistent with the briefs. No disrespect is intended.

A-0931-20

Entering his mother's apartment, Armando saw her body "on the floor, her face distorted, swelling up . . . blood around her, and a cut on the side of the neck." He also noticed a knife and tape on the floor. Armando called 9-1-1 and informed the operator that his mother was dead.

The Police Investigation of the Victim's Residence

At the scene, police officers found several "blood swipes" both inside and outside of Viejo's apartment. According to Detective Kickey, that signified "an object or something that already has blood on it," like "a glove or a piece of fabric," had come into contact with a clean surface. Kickey testified that officers found blood swipes on the iron gate outside the main front entrance of the home, on the inside of the storm door to the main entrance, on the exterior doorknob of the main entrance, on the interior of the main entrance door, and on the doorknob inside the vestibule area. Kickey also testified that the officers found blood swipes on a light switch that controlled the exterior porch lights, located in the hallway that led to Viejo's apartment on the first floor.

Investigating officers found two bloody knives in the apartment: a serrated knife on a night table and a straight edge knife on the floor. The knives appeared to have been Viejo's, as they matched other knives in a kitchen drawer.

4

Officers also found shoeprints in some of the blood stains. The State Police Office of Forensic Sciences ("OFS") later confirmed that the shoe impressions were created by a Nike Air Jordan brand shoe but noted that multiple models of the shoe could have made the impression.

The officers further observed the contents of at least two purses and wallets on the ground, all with blood stains on them. Armando noticed that everything in his mother's room was "upside down," as though "[p]eople had looked . . . for valuables or something all around the apartment, especially in the bedroom."

Autopsy Findings

An autopsy revealed that Viejo had suffered numerous blunt-force injuries from her forehead to her chin and across the front and sides of her face. Her nose was dislocated. Viejo also had a small bruise under her right collarbone and minor injuries to her abdomen. She had defensive wounds to the back of her right and left hands, including a superficial cut on her left thumb consistent with a serrated knife wound. Viejo also suffered two penetrating stab wounds and multiple wounds to her neck, made with a sharp object. In light of this evidence, Viejo's cause of death was ruled a homicide.

A-0931-20

<u>Surveillance Videos from the Victim's Residence</u>

Of particular importance to the identification proofs in this case, Viejo had a video-surveillance system in her home. The system had two functioning cameras and a monitor in her bedroom so that she could observe the camera footage. One camera, which was placed outside of the house, observed the front porch and the outer door and also some of Lexington Avenue. The second camera was placed inside the home in the hallway leading to Viejo's first-floor apartment facing the interior of the secondary door.

The camera outside Viejo's residence showed that at approximately 9:59 p.m. on February 6, a hooded and masked individual approached the main front door. The video showed the hooded individual unsuccessfully attempting to unlock the front door with a key. Armando said Viejo kept a spare set of keys by flowerpots outside of the outer door, but the locks had been changed and the keys by the flowerpots no longer fit the current lock.

The video showed the individual briefly leaving Viejo's porch, only to return and ring the doorbell. At that point, the main front door opened, and the individual rushed through the main door into the vestibule. Armando testified that not many people had a key to Viejo's apartment and that Viejo would not open the door for someone she did not recognize. A video from the camera

6

inside the hallway showed the hooded and masked individual behind Viejo, pushing her further into her first-floor apartment. The video showed the hooded individual leave the home and turn off the lights a short while later.

Video Footage from Across the Street

A security camera across the street from Viejo's home at another residential address on Lexington Avenue, which is next to defendant's house, also had relevant surveillance video footage. The video showed that at approximately 10:36 p.m.,[3] Viejo's front porch lights turned off and a hooded individual exited the front door, turned left, and walked down and across Lexington Avenue with a bag. Two minutes later, at 10:38 p.m., an individual walked down Lexington Avenue in the opposite direction with a bag in hand and turned into the front gate of defendant's residence.

Defendant's Conversation on the Street with Officer Salmon

On Sunday, February 7, the day after Viejo's death, Officer Sherika Salmon of the HCPO approached defendant after she had noticed him standing outside of his home watching the officers investigate the crime scene. According to Salmon, defendant identified himself to her as "Jeffrey Olden,"

---

[3] The time stamps on some of the videos were adjusted to comport with the actual time, with no objection.

spelling the name for the officer as she wrote it down. Defendant told Salmon that he worked for "Blue Apron" in Jersey City and that he had just gotten off work and heard of the incident from his neighbors that morning. Salmon called Blue Apron to confirm these details and learned that Blue Apron did not employ anyone by the name of Jeffrey Olden. She then found out the company also did not employ a Jeffrey Harley.

The February 8 Interview of Defendant at the Police Station

HCPO Detective Guershon Cherilien testified that on Monday, February 8, 2016, he and Detective William Caicedo[4] interviewed defendant at the police station. We discuss the details of that interview, infra, in Part II of this opinion. As we will describe, defendant was not given Miranda warnings during that interview. He made several incriminating statements that the State admitted against him at trial and emphasized in its closing argument.

The Brothers Review the Surveillance Footage

On Tuesday, February 9, 2016, Armando and his brother, Victor, went to the homicide unit of the HCPO to review the surveillance camera footage from

---

[4] The unofficial transcript prepared for the HCPO identifies the second officer as a "Detective Swinney." However, in Cherilien's testimony, he states that the second officer was Caicedo. We therefore use the name provided in Cherilien's testimony.

Viejo's home and from the residence across the street. According to a report from the HCPO, Armando and Victor at that time were "unable to conclusively identify any of the parties depicted." However, "Victor pointed out that the individual walking west on the south side of Lexington Ave. appeared to resemble a neighbor, 'Tyrone' that lives across the street." By "Tyrone," Victor meant defendant.

The March 8 Interview of Armando

One month later, on March 8, 2016, Detective Kickey and another detective interviewed Armando at the HCPO's homicide unit. During that interview, Armando said he recalled watching video surveillance footage from cameras at his mother's home and from across the street. Armando said that when watching the video, he was able to identify the subject of the video as defendant and said that he recalled that "after the guy that had come out of my mom's house crosses the street, a few minutes later, I see Tyron[e] coming back to his home. That's what I said when I looked at the video the first time."

Armando watched the surveillance footage again on March 8, 2016. He confirmed that he could identify defendant as the man who came out of his mother's house and then reappeared in the video and who walked back to defendant's house with a bag in his hand.

9

Armando told the detectives that he knew defendant as his mother's neighbor across the street and that they would "ha[ve] short conversations throughout the years." Armando said defendant used to help Viejo clean up the yard and shovel snow and that he had asked defendant to keep an eye on his mother "because [he] knew it was a rough neighborhood." Armando recalled defendant previously had asked him whether he could rent Viejo's basement apartment, and Armando told him he could not and that Viejo said it would not be "a good idea." Armando noted that Viejo rented the basement apartment to a family friend, but after that tenant moved out in January 2016, defendant avoided Armando whenever he went to Viejo's house. Finally, the detectives showed Armando a still image from the security footage from across the street. Armando confirmed the subject of that image was defendant, and he signed the back of the photo.

Defendant's Arrest and Evidence Recovered from His Residence

On March 11, 2016, the HCPO, with the assistance of the FBI, arrested defendant and executed a search warrant of defendant's home. The officers recovered several Nike Air Jordan sneakers but could not confirm that any of the shoes had made the impressions observed in Viejo's apartment.

Officers also recovered from defendant's home the lid to an electronic trash can and a mop head, both of which had observable blood stains. Additionally, the officers observed and marked a number of blood stains that were present in various rooms of defendant's home. However, the OFS concluded that the samples were too degraded for testing.

The Attempted Re-Interview of Defendant

Defendant was brought in a second time for an interview at the HCPO on March 11, 2016, by Cherilien and another detective. At the outset of the interview, the detectives told defendant that he was under arrest as of 3:05 p.m. that day and then was advised of his rights against self-incrimination. Defendant acknowledged his rights and told the detectives that he did not wish to speak. No further questioning occurred.

The Interview and Trial Testimony of Defendant's Ex-Girlfriend

On August 11, 2017, over a year after defendant's arrest, Detective Cherilien interviewed defendant's ex-girlfriend. They discussed her three-and-a-half-year relationship with defendant and then she and Cherilien left the room to view the surveillance camera footage from across the street from the victim's residence. When they returned, Cherilien told her that the video was from across the street and "in that video is a male returning to his residence." The ex-

A-0931-20

girlfriend identified defendant as the subject of the video. She was also shown a screenshot from the surveillance footage, and she again identified the subject as defendant and signed the back of the photograph to confirm that identification.

At trial, defendant's ex-girlfriend testified she recognized the subject of the video as defendant because "I just know Tyrone. I know Tyrone. That's Tyrone. I've been around him long enough to know him." She testified that she had broken up with defendant in January 2016, one month before Viejo's homicide. She said defendant "continually" called her and talked about the two getting back together. She testified that during their relationship, defendant did not buy her things or take her out to eat, with the exception of one instance. However, on February 18, 2016 (i.e., twelve days after the killing), defendant took her out to eat and dance and paid for everything in cash.

The Indictment

The grand jury charged defendant with eleven counts of offenses:

- third-degree burglary (N.J.S.A. 2C:18-2(a)(1)) (count one);

- second-degree burglary (N.J.S.A. 2C:18-2(b)(1)) (count two);

- first-degree felony murder (N.J.S.A. 2C:11-3(a)(3)) (counts three and six);

12

- second-degree robbery (N.J.S.A. 2C:15-1(a)(1)) (count four);

- first-degree armed robbery (N.J.S.A. 2C:11-3(a)(3)) (count five);

- third-degree possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4(d)) (counts seven and nine);

- fourth-degree unlawful possession of a weapon (N.J.S.A. 2C:39-5(d)) (counts eight and ten); and

- first-degree murder (N.J.S.A. 2C:11-3(a)(1) and -3(a)(2)) (count eleven).

The trial court denied various pretrial motions by defendant, including his motion to suppress his police interview statements, which we will discuss in depth in Part II.

The 2018 Mistrial

Defendant's first trial took place in January and February 2018. The jury deliberated for seven days. The trial court declared a mistrial upon concluding that the jury was unable to reach a unanimous verdict on any of the eleven counts and that further deliberations would be futile.

13

<u>The 2019 Second Trial</u>

Defendant's second trial began on May 1, 2019, and ended eight days later. At the close of the State's case, defendant moved for a judgment of acquittal as to all charges.

Defendant argued the State had failed to produce any physical evidence that proved he was ever inside Viejo's residence, let alone on the night of the homicide, and specifically cited that there was no DNA or blood evidence linking defendant to the murder. Defendant further asserted the State's case was conjectural and would require the jury to speculate and "connect the dots."

The State, in response, relied on the video evidence and the "countless number of hours' worth" of footage that the jury had observed over the course of the trial. The State further argued that defendant's ex-girlfriend had identified him based on the video and photographic evidence produced.

The court denied the acquittal motion. Defendant did not testify, and he did not present any witnesses.

<u>Charge Conference</u>

The court conferenced with the attorneys several times regarding the jury charges. The court specifically went over the jury charge with respect to defendant's police statements. The State also requested a flight charge, which

the court granted based on the fact that the assailant had left the scene and discarded physical evidence.

With respect to defendant's statements made to the police, the court instructed the jury to:

> consider whether the statement or any portion of it is credible. You should therefore receive, weigh, and <u>consider such evidence with caution</u>. And in considering whether or not the statement [is] credible, you should take into consideration the circumstances and facts as to how the statement was made, as well as all the other evidence in this case, relating to this issue.
>
> [(Emphasis added).]

The Guilty Verdict

On the second day of deliberations the second jury returned a verdict and convicted defendant of first-degree murder (count eleven), as well as third-degree burglary (count one); second-degree burglary (count two); first-degree felony murder (counts three and six); second-degree robbery (count four); first-degree robbery (count five); third-degree possession of a weapon for an unlawful purpose (count seven); and fourth-degree unlawful possession of a weapon (count eight).

A-0931-20

Sentencing

In July 2019, the trial court sentenced defendant to life imprisonment without the possibility of parole on count eleven, into which counts three, six and seven merged. The court imposed a consecutive twenty years' imprisonment with an eighty-five percent parole bar pursuant to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, on count five, into which count four merged, and ten years' imprisonment subject to the NERA parole bar on count two, into which count one merged. Finally, the court imposed a consecutive eighteen months' imprisonment on count eight.

In total, the trial court sentenced defendant to an aggregate sentence of life imprisonment without parole plus thirty-one-and-a-half years, to be served consecutively.

This appeal ensued.

## II.

Defendant's primary argument is that the court erred in admitting at trial the unwarned statements he had made to detectives during his February 8, 2016 interview at the HCPO.

When this appeal was first briefed, both appellate counsel were under the mistaken impression that the trial court never held a suppression hearing

A-0931-20

concerning those statements. However, after we asked counsel to investigate the procedural history, they discovered that a hearing was indeed conducted. Consequently, we directed that the hearing be transcribed. The transcript revealed that, after hearing testimony and watching portions of the video-recorded interview, the motion judge orally ruled that the statements were not the fruit of a custodial interrogation and thus were admissible. The judge stated he would amplify his reasoning if requested to do so. No such request was made by counsel. Nonetheless, we remanded the matter for that purpose. The judge issued a written amplification, reiterating that the detectives' questioning of defendant was not a custodial interrogation. The parties then submitted to us post-remand supplemental briefs addressing the amplification, and they also presented to us oral argument.

Those steps having been taken, we now address the suppression issue. The pertinent background is as follows.

## A.

### The February 8 Questioning of Defendant at the Prosecutor's Office

As we noted above, on February 8, 2016, two days after Viejo's death, Detectives Cherilien and Caicedo interviewed defendant at the HCPO. Before arranging that interview, the detectives reviewed the surveillance video footage.

They also retrieved from the footage a screenshot of a suspect whom they believed resembled defendant. Apart from that perceived resemblance, Cherilien found it "curious" that defendant had given a false name to Officer Salmon on the street.

According to Cherilien, he called defendant and suggested that he come to the HCPO to give a voluntary statement. Defendant agreed to do so. Cherilien specified a time and place for the interview. As he recalled it, "I said I would—I was going to transport him to the homicide base. We just wanted him to come down and speak to us."

Cherilien and Caicedo picked defendant up in a police vehicle and drove him to the HCPO's homicide unit, where they placed him in an interrogation room. According to Cherilien, the detectives did not handcuff or restrain defendant. They did not "formal[ly] arrest" him.

The two detectives spoke with him for approximately one hour. The interview was video recorded.[5] No one else was present. The record does not disclose whether the door to the interrogation room was locked.

At the outset, Cherilien told defendant that he was there to "answer questions concerning [his] knowledge of a matter now under investigation

_____

[5] We have reviewed the video and the associated transcript.

involving the death of Lucila Cardenas Viejo." Defendant responded that he was willing to reply to questions. Cherilien then placed defendant under oath and told him that "[t]his oath carries the same responsibility as an oath that you would swear before a grand jury or a trial. Violation of that oath constitutes the charge of perjury."

According to Cherilien, when he conducts an interview with a person considered to be a suspect, he customarily first advises the suspect of the right to remain silent. Here, Cherilien did not issue Miranda warnings to defendant at any point of the interview. Cherilien explained this was because, according to Cherilien, he subjectively considered defendant at that time to be a mere witness and not a suspect.

During the interview, defendant said he last recalled seeing Viejo on the afternoon of Saturday, February 6, 2016. The detectives then asked him to "walk [us] through your Saturday." Defendant recounted that he woke up late on Saturday and watched television until his cousin came over. The two of them then went to a restaurant near his home.

According to defendant, later that evening, close to 9:15 p.m., he left his house wearing black pants and black boots and went to a local bar. He claimed he had ordered a shot of gin and sat and drank at the bar for approximately thirty

minutes. Defendant stated he then left the bar and ran into one of his neighbors. The two of them allegedly went back to the same bar and had more drinks. Defendant claimed he then went to a restaurant, ordered food, and went straight home.

At this point of the interview, the detectives left the room to obtain their sergeant's approval to show defendant a screenshot from the neighbor's video footage. The screenshot depicted a person walking into defendant's driveway and front yard, which the detectives hoped would "actually orient [him]."

After showing defendant the screenshot, the officers pressed him about the identity of the person within it. Caicedo told defendant, "[w]e see the individual actually come over here and go right into your driveway. So we're trying to figure out—you're 100 percent that that's not you?" Defendant replied that it was not him, stating, "[h]old up. No. I swear . . . I would never in my life do nothing like [that]."

Caicedo responded, "[w]e're not suggesting that you did anything." He further stated the detectives were "not railroading anything here," but "[i]f that's not you, then what we're trying to see is—if you know this individual because he clearly goes into your driveway like he knows the place." (Emphasis added). Caicedo added, "[b]ecause you see how it adds up that he looks like he's going

into your driveway. He's kind of got the bald head.[6] <u>That's why we figured we should talk to you because either you know him or—</u>." (Emphasis added).

The detectives continued to probe defendant about the evidence that depicted someone walking up his property. Caicedo remarked to defendant that "I see you're getting, like, nervous . . ." Defendant responded that he "has a mother" and "follows a code" and would not mislead the detectives.

The detectives then left the room for about six minutes to confer with their sergeant again. Before departing, one of the detectives asked defendant if he wanted anything to drink and informed him there was a restroom he could use if needed. Defendant remained in the room.

After the detectives returned to the interview room, Cherilien told defendant that "when we met with you yesterday . . . there were some dates that you told us that didn't add up. So that's why it kind of threw us off. We weren't sure if we were dealing with . . . a friend or a foe." The detectives then confronted defendant about him telling Officer Salmon that he worked at Blue Apron and that his name was Jeffrey Olden, neither of which was true. Defendant replied this was likely a mistake on Salmon's part, as he recalled telling her that he worked "in Bayonne" and that his name was Jeffrey Harley.

---

[6] The interview video clearly shows defendant as bald.

After giving defendant a chance to add to his statements, Caicedo asked him whether he ever had been in Viejo's house. Defendant denied ever being there.

The interview ended, and the officers drove defendant home. At no point did defendant request to speak with counsel or to have the questioning cease.

The December 2017 Suppression ("Rule 104") Hearing

Before the first trial, the State moved for an N.J.R.E. 104 hearing on the admissibility of defendant's recorded statement to the police. The parties agreed the State would need to carry the burden of showing the statement was admissible despite the absence of Miranda warnings.

The hearing took place on December 14, 2017. The court heard testimony from Detective Cherilien. No other witness testified.

The State argued that the interview raised "no Miranda indications" and that it was "a voluntary and noncustodial statement." In his testimony at the hearing, Cherilien asserted that he had interviewed defendant as a witness, not as a suspect. Cherilien explained the detectives decided to interview defendant to follow up on the inconsistencies uncovered in the February 7, 2016 "field interview" with Officer Salmon.

The State played for the court the recording of the February 8, 2016 interview. Cherilien answered questions about the interview.

The court stopped the recording and suggested that it would review the recording itself and rely on the submissions to assess the Miranda issue. Counsel agreed to that suggestion.

During his brief cross-examination at the hearing, Cherilien reiterated his contention that he "was treating Mr. Harley as a witness." The detective stated that he had not been sure if defendant had purposefully given false information during the field interview. Notably, Cherilien acknowledged he did not believe the detectives had shown the screenshot from the video footage to any other witnesses in the case, apart from Armando and the ex-girlfriend.

Before concluding the suppression hearing, the court inquired whether the parties wanted to brief the admissibility issue. Defendant's counsel declined, stating the defense would submit to the "[c]ourt's wisdom on [the] issue."

The Court's January 2018 Oral Ruling

On January 5, 2018, the court announced in a brief oral ruling[7] that it "would permit the State to use [the prior statement]" and that it could "amplify [its] reasons if necessary. But certainly, based upon [its] review of the transcript

_____

[7] The same judge who ruled on the pretrial motions also presided over each trial.

record, the testimony, [and] DVD [recording], there was no custodial interrogation."

Use of Defendant's Interview Statements During the 2019 Trial

At trial, the State presented the recording of defendant's interview as part of its case-in-chief. Thereafter, in his closing argument, the prosecutor featured the interview, playing back for the jurors the recording of the interview. The prosecutor framed his summation around defendant's statements:

> You know what [] [defense counsel] didn't bring up during his summation? The defendant's statement. Why is that? Because, ladies and gentlemen, it was replete with lies. And we're going to prove to you, and we're going to show you how he lied throughout his statement, and how his story fell apart.
>
> . . . .
>
> And we're going to watch his statement, so you can tell. And ladies and gentlemen, part of your role as jurors is to judge a person's demeanor, how they are reacting to certain questioning. Okay? And you're going to see how his story completely falls apart, step, by step, by step.
>
> . . . .
>
> If you're searching for <u>one last bit of evidence that leaves you firmly convinced</u>, then I leave you with the defendant's own words. ["]I'm 110 percent sure that's not me.["] <u>If he lied, he is guilty. It shows what is called a consciousness of guilt. He knew it was him on that video, and his story began to fall apart</u> . . . You're

A-0931-20

going to go back into the jury room, and you're going to have all the exhibits. If you want to listen to any of the testimony, you can ask for it.

[(Emphasis added).]

During deliberations, the jury requested to have the recording of the February 8 interview replayed and watched it in its entirety. The jury then returned a guilty verdict on the second day of deliberations.

The Trial Court's Post-Remand Amplification

As noted above, once we learned of the existence of the Rule 104 hearing and noted the trial judge's willingness to amplify his reasoning, we remanded the matter to the judge for such an amplification, mindful of the intervening passage of time. State v. Harley, No. A-0931-20 (App. Div. Dec. 17, 2024).

In a written amplification dated February 13, 2025, the judge explained his decision to admit defendant's statement. The judge found the session at the HCPO to be "a witness interview rather than a custodial interrogation."

The judge concluded defendant had not been in custody, based on the following reasons: (1) the interview took place in the early stages of the investigation when detectives were focused on gathering initial statements and understanding the case; (2) defendant's interview was "not an accusatory interrogation"; (3) defendant voluntarily participated in the interview and there

was no restraint placed on his freedom; (4) defendant had previous interactions with law enforcement and as a result should not have perceived himself as being in custody; (5) defendant requested a ride to the police station;[8] (6) defendant was not cut off from the outside world because he had his cell phone in the interrogation room; (7) the two detectives sat between defendant and the door only to properly film the interview, not to prevent defendant from leaving or to control his movements; (8) the oath defendant was required to take was merely standard procedure, not an indicator of coercion; (9) the detectives did not accuse defendant of lying; they merely clarified an inconsistency in his prior statement; and (10) the interview lasted only just over an hour and he was not left to wait for extended periods of time.

The judge distinguished defendant's interview from the interview in State v. Bullock, 253 N.J. 512, 532 (2023), by highlighting that, unlike the defendant in that case, defendant was not approached as a suspect, the police officers were not armed, and defendant had prior experience with officer encounters.

The judge likened the circumstances here to Oregon v. Mathiason, 429 U.S. 492 (1977). In Mathiason, the Supreme Court of the United States held

---

[8] We again note this fact is disputed and not clear from the record supplied on appeal.

that when a suspect voluntarily goes to a police station for questioning, is informed that he is not under arrest, and leaves without hindrance after the interview, he is not considered to be in custody for purposes of Miranda warnings. However, unlike the defendant in Mathiason, defendant was not told he was not under arrest, nor was he told that he was free to leave.

The judge thereby concluded that the interrogation was non-custodial and reaffirmed his previous decision to admit the statement. Defendant has expanded his appeal to include that remand determination.

B.

Scope of Review

Our scope of review of this issue is well established. In reviewing a trial court's ruling on the admissibility of a defendant's statement, an appellate court generally "defer[s] to the trial court's factual findings that are supported by sufficient credible evidence in the record and will not disturb those findings unless they are 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Rivas, 251 N.J. 132, 152 (2022) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). By contrast, "the interpretation of law 'and the consequences that flow from established facts' are not entitled to deference and are reviewed de novo." State v. Carrion, 249 N.J. 253, 279 (2021)

A-0931-20

(quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

That said, we must also be mindful that "'[t]he privilege against self-incrimination, as set forth in the Fifth Amendment to the United States Constitution, is one of the most important protections of the criminal law.'" State v. Cotto, 471 N.J. Super. 489, 512 (App. Div. 2022) (quoting State v. Sims, 250 N.J. 189, 211 (2022)). "Accordingly, '[w]hen faced with a trial court's admission of police-obtained statements, an appellate court should engage in a "searching and critical" review of the record to ensure protection of a defendant's constitutional rights.'" Id. at 513 (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)).

The Miranda Doctrine

The substantive principles of law concerning the Miranda doctrine and custodial interrogations are also well settled. Miranda instructs that before law-enforcement officials subject someone to custodial interrogation, the person must be advised as follows:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.
>
> [Miranda, 384 U.S. at 479.]

In New Jersey, "'[t]he right against self-incrimination is [also] . . . embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503.'"[9] Bullock, 253 N.J. at 532 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)).

The absence of Miranda warnings in settings of custodial interrogations "'creates a presumption of compulsion,' and any unwarned statements must be suppressed—even when they 'are otherwise voluntary within the meaning of the Fifth Amendment.'" State v. Tiwana, 256 N.J. 33, 41 (2023) (quoting Oregon v. Elstad, 470 U.S. 298, 307 (1985)).

"A defendant may waive any or all of those rights; however, that waiver must be 'voluntary, knowing and intelligent.'" Hubbard, 222 N.J. at 265 (quoting Hreha, 217 N.J. at 382). This signifies that "[a] confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights." Ibid.

In New Jersey courts, "the State bears the burden to show scrupulous compliance with Miranda." State v. Dorff, 468 N.J. Super. 633, 651 (App. Div.

---

[9] "[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty . . . ." N.J.S.A. 2A:84A-19; N.J.R.E. 503 (repeating the same text).

2021); see also State v. Bey, 112 N.J. 123, 134 (1988) ("the State must prove admissibility beyond a reasonable doubt").

"Custodial Interrogation" Defined

Our Supreme Court has explained the two components of custodial interrogation as follows. "Custodial interrogation is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Tiwana, 256 N.J. at 41 (citing Miranda, 384 U.S. at 444) (emphasis added). "[W]hether a suspect must be informed of the rights under Miranda depends on (1) whether the suspect is in police custody, and (2) whether police subjected the suspect to interrogation." Id. at 41-42 (citing Hubbard, 222 N.J. at 266).

"'Custody' for the purposes of Miranda requires a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" State v. Erazo, 254 N.J. 277, 298 (2023) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). The issue of custody is "fact-sensitive and sometimes not easily discernible." State v. Stott, 171 N.J. 343, 364 (2002). "The relevant inquiry is determined objectively, based on how a reasonable [person] in the suspect's position would have understood his situation," rather than "on the subjective views harbored by either the interrogating officers or the person being

questioned." Hubbard, 222 N.J. at 267 (internal quotation marks omitted) (emphasis added). "[W]hether police consider someone a 'suspect,' 'person of interest,' or 'witness'" is not dispositive. Erazo, 254 N.J. at 299 (citing State v. Keating, 277 N.J. Super. 141, 148 (App. Div. 1994) ("What the police had in mind . . . is not the issue; the issue is whether defendant reasonably believed that he was in custody when being questioned.")).

Other relevant circumstances and factors to be considered in evaluating the level of restraint include the time, place, and duration of the detention; the physical surroundings; the nature and degree of the pressure applied to detain the individual; language used by the officer and objective indications that the person questioned is a suspect. See Stansbury v. California, 511 U.S. 318, 325 (1994); State v. Ahmad, 246 N.J. 592, 611 (2021).

The nature of the questioning can support a finding of custody. For example, in Hubbard, the Court found that the substance and tone of the interview was a contributing factor to a determination that the defendant's interrogation "was custodial in nature." 222 N.J. at 272. The Court noted that the interview was a custodial interrogation where the questions "reflect[ed] a clear attempt on the part of the detective to cause defendant to incriminate

31

himself" rather "than [an] attempt to secure information that may have assisted the [victim's] treatment." Id. at 271-72.

The parties do not dispute that the tenor of the detectives' questioning of defendant on February 8 was an "interrogation." "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 267 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).

Recent Case Law

Recent case law in our state has illuminated these concepts further. In Bullock, a defendant was found to be in custody for Miranda purposes when university police officers questioned him in the courtyard adjacent to a residence hall regarding an allegation that he had threatened to kill his girlfriend's parents. 253 N.J. at 538. The defendant was in the hallway of the residence hall when an officer first encountered him, confirmed his identity, and advised the defendant he was there to investigate an incident. The officer then escorted the defendant out to the courtyard where three uniformed, armed officers surrounded the defendant and asked him questions about the alleged threats.

Body-worn camera footage showed the defendant's freedom of movement was limited. The Court found that it was "hard to imagine that a reasonable person in defendant's position would have felt free to leave under those circumstances." Ibid.

By comparison, in the Court's subsequent opinion in Erazo, it found that a defendant was not in custody during his first interview with detectives about his eleven-year-old neighbor who had gone missing, and, thus, he was not owed Miranda warnings. 254 N.J. at 299. The defendant in Erazo rode voluntarily and unrestrained with officers to the police station, he expressed the desire to cooperate in the investigation, and he sat in a common area with other witnesses and the victim's family at the station. Ibid. Because he was in an unfamiliar place he was escorted to the interview room, but he was never restrained and remained in an unlocked room for some time including the ninety-minute interview. Significantly, Erazo was not asked about the victim's death during the interview. It was only after the interview that police learned of information making the defendant a suspect. Ibid.

Applying these principles, we conclude the trial court erred in finding the detectives' questioning of defendant at the HCPO was not a custodial interrogation. We reach that conclusion for numerous reasons.

33

First and foremost, defendant objectively was not "free to leave" the interview room and the prosecutor's office. Regardless of whether that was true at the outset of the session, it was certainly true by the point the detectives showed defendant the screenshot images and peppered him with accusatory questions about the identity of the person shown in the videos. A reasonable person in defendant's shoes would not realistically believe he could walk out of the interview room without adverse consequences.

As defendant has emphasized, he was outnumbered in the interview room by two officers. The interview video shows one officer was positioned between defendant and the doorway. The officers administered an oath to defendant before questioning him, underscoring the formality of the event. They threatened him with a perjury charge if he violated the oath. The officers never told defendant he was free to leave. Regardless of who initially proposed transporting defendant to the HCPO, defendant was there without a vehicle of his own to drive away. He was left alone in the room only very briefly on two occasions when the detectives stepped out to speak with their sergeant, while the video camera recording him remained running.

We recognize Detective Cherilien testified that he personally thought defendant was free to leave and that the trial court found the detective's

34

testimony credible. But, as we noted above, the law does not make the subjective opinions of police officers dispositive of custody. See, e.g., Hubbard, 222 N.J. at 267. Instead, the situation must be viewed objectively.

Detective Cherilien admitted that from the outset of the interview, he doubted whether defendant had been truthful when he gave his supposed name and employer the previous day to Officer Salmon. The officers also knew that defendant lived only a few houses away from the victim and that the person filmed on the surveillance videos appeared to resemble defendant. Notably, there is no evidence that the detectives showed any of the other people who they interviewed the screenshot and demanded those other persons say whether they were the individual on the video.

Further, it is undisputed that the manner of questioning defendant was an interrogation. Defendant was placed under oath. The detectives made pointed inquiries of defendant—including where he went that night and what he was wearing—and accusatory insinuations that he was the person on the video footage and screenshot. They also expressed skepticism about his sworn answers. The accusatory tenor of the questioning fortifies our conclusion that defendant was in custody. It would have become very clear to defendant by the middle of the questioning that he was in trouble and that the officers had strong

reasons to believe he had murdered Viejo. As in <u>Hubbard</u>, the questions "reflect[ed] a clear attempt on the part of the detective to cause defendant to incriminate himself." 222 N.J. at 272. The situation was unlike the one the Court evaluated in <u>Erazo</u>, in which the police did not ask the defendant comparable accusatory queries and did not have the same amount of inculpatory information before the interview. 254 N.J. at 299.

In sum, the detectives treated defendant as a suspect and not as a mere potential witness. By at least the middle of the interview after the detectives conferred with their sergeant, defendant was manifestly in custody and not free to walk out.

The trial court on remand did not address our explicit suggestion to consider whether the interview evolved into a custodial interrogation, instead treating it as a continuous, static situation that defendant could have walked away from at any time. We disagree.

Although the facts here are not identical to those in <u>Bullock</u>, the conclusion is the same: It is "hard to imagine that a reasonable person in defendant's position would have felt free to leave under those circumstances." 253 N.J. at 538.

A-0931-20

We have considered the other factors identified by the State and the trial court weighing against a finding of no custody. None of them tip the balance to change our assessment of the circumstances as a matter of law. To be sure, there is no indication the interrogation room was locked, or that the one-hour of questioning was prolonged, or that defendant was instructed he could not terminate the interview and go home. Even so, we conclude the totality of circumstances are, on the whole, more indicative of a custodial interrogation. Viewed objectively, the court erred in discerning no custodial interrogation and in admitting the interview statements.

Because defendant was subjected to a custodial interrogation, the officers were obligated to issue him <u>Miranda</u> warnings. They failed to do so. Hence, his unwarned statements should not have been admitted into evidence or otherwise made known to the jury.

We reject the State's argument that the admission at trial of defendant's unwarned statements was harmless. When, as here, a defendant makes unwarned self-inculpatory statements in violation of the <u>Miranda</u> doctrine, our case law rarely considers the wrongful admission of the statements to be harmless. <u>State v. Wade</u>, 252 N.J. 209, 220 (2022); <u>State v. McCloskey</u>, 90 N.J. 18, 31 (1982). It does not matter that defendant did not confess to attacking,

killing, and robbing Viejo.  The critical point is that the State caught defendant lying to the detectives and presented those lies to the jury.  As we have shown above, the State capitalized on those falsehoods in its closing argument, telling the jurors they must convict defendant of the charged offenses if they found he had lied.  The jurors notably requested a playback of defendant's interview.  In addition, the proofs of defendant's guilt were not overwhelming, as reflected by the seven days of deliberation leading to the first hung jury.

We therefore reverse the trial court's denial of the motion to suppress defendant's interview statements. We vacate his conviction and remand for a new trial.

III.

For the sake of completeness, we briefly address defendant's remaining arguments on other issues.  As they are set forth in his main brief:

> POINT II
>
> THE COURT ERRED BY (1) FAILING TO PROVIDE THE JURY WITH ANY INSTRUCTION ON HOW TO ASSESS THE OUT-OF-COURT IDENTIFICATION EVIDENCE, INCLUDING THAT IDENTIFICATION HAD TO BE PROVEN BEYOND A REASONABLE DOUBT, AND (2) ADMITTING THAT EVIDENCE WITHOUT HOLDING A WADE-HENDERSON HEARING TO TEST ITS RELIABILITY. (Not raised below).

POINT III

THE ERRORS, INDIVIDUALLY AND CUMULATIVELY, REQUIRE A NEW TRIAL. (Not raised below).

POINT IV

ALTERNATIVELY, THIS COURT MUST REMAND FOR RESENTENCING, BECAUSE THE JUDGE ERRED BY IMPOSING MULTIPLE MAXIMUM CONSECUTIVE TERMS.

A.

Defendant presents two arguments concerning the identification evidence admitted at trial against him. Neither of these arguments was raised in the trial court, so we evaluate them through a plain-error scope of review. State v. Clark, 251 N.J. 266, 286-87 (2022). Pursuant to that standard, an unchallenged error constitutes plain error only "if it was 'clearly capable of producing an unjust result.'" Id. at 287 (quoting R. 2:10-2). Subject to that plain-error exception, "a party may generally not 'urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict.'" State v. Macchia, 253 N.J. 232, 251 (2023) (quoting R. 1:7-2).

First, defendant contends the trial court was required to charge the jury specifically that the State had to prove identification beyond a reasonable doubt

and also provide the jurors with particular instructions to guide them in assessing the identification testimony by Armando and his ex-girlfriend. These arguments are without merit.

The court duly instructed the jury that the State had the burden of proving each of the elements of the charged offenses beyond a reasonable doubt. The court further instructed the jury that defendant did not have to prove his innocence or offer any proof of innocence.

The court did not have an obligation, sua sponte, to also issue the model jury charge specifically concerning out-of-court identifications. See Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. May 18, 2020). That special charge concerns identifications that an eyewitness made of a perpetrator "at the time the offense was being committed" or "after observing the incident." Id. at 1, 7-8. Neither Armando nor defendant's ex-girlfriend were present when Viejo was attacked. They did not observe the incident. Their identifications of defendant after being shown the video footage and screenshot were confirmatory in nature. To date there is no model charge for such confirmatory identifications nor any case law requiring the court to craft and issue such a charge, sua sponte. If the case is tried again, counsel may

raise a request for an instruction during the charge conference and the State and the court may consider it.

Second, defendant contends the court was obligated to conduct a Rule 104 hearing on the identifications by Armando and the ex-girlfriend, despite the fact that defendant did not request such a hearing. Defendant believes that the interactions of those witnesses with the detectives may have had elements of "impermissible suggestiveness" that could have led to mistaken identifications. See State v. Henderson, 208 N.J. 208, 238 (2011). A defendant, however, has the initial burden of presenting evidence of suggestiveness that would necessitate a hearing. Id. at 288. There is "no automatic entitlement to an evidentiary hearing." State v. Ruffin, 371 N.J. Super. 371, 391 (App. Div. 2004). See also United States v. Wade, 388 U.S. 218, 241-42 (1967). Here, no such showing was made to the trial court. Moreover, our Supreme Court has noted a hearing is not required for a confirmatory identification in which, as here, the "witness identifies someone he or she knows." State v. Pressley, 232 N.J. 587, 592-93 (2018). Both Armando and the ex-girlfriend knew defendant before the crimes occurred and before they were shown the surveillance footage and screenshot, referring to him by name to the officers. No sua sponte hearing was required. We therefore reject defendant's argument for a reversal on this

basis, without prejudice to him moving for a hearing or other appropriate relief before a third trial.

B.

We need not comment on defendant's argument of cumulative error under State v. Sanchez-Medina, 231 N.J. 452, 469 (2018), because it is partly based on the suppression issue that we have already determined in Part II requires a new trial.

C.

Defendant argues the multiple consecutive sentences the trial court imposed were excessive and not sufficiently justified by the court. Among other things, defendant contends the court misapplied the aggravating and mitigating factors, State v. Case, 220 N.J. 49, 69 (2014), and did not delineate sufficiently the propriety and overall fairness of the consecutive terms, State v. Yarbough, 100 N.J. 627, 643-45 (1985); see also State v. Torres, 246 N.J. 246, 264 (2021).

These sentencing issues are mooted by our decision to grant a new trial. Nonetheless, for the sake of completeness, we note that had we not vacated defendant's conviction, we would have remanded for resentencing with respect to the consecutive treatment of the sentences under the criteria of Yarbough and Torres. The life sentence imposed for murder, however, does not shock our

conscience nor reflect an abuse of discretion. <u>State v. Bieniek</u>, 200 N.J. 601, 608 (2010).

IV.

To the extent we have not addressed them, we have considered all the remaining points and sub-points raised on appeal and deem them of insufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(2).

We add a final word. We are mindful this brutal killing occurred nearly a decade ago and has already been the subject of two jury trials. We recognize the burdens on the State, defendant, and the witnesses that are attendant to trying this case one more time—long after the critical events. Yet the constitutional rights at stake are too important to overlook or to treat as minor formalities. We are constrained to vacate the convictions and remand to the trial court for further proceedings and, if necessary, a third trial.

Vacated and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0931-20